Argued June 2, affirmed December 12, 1916.

# STATE v. FARNAM.*

(161 Pac. 417.)

**Indictment and Information—Homicide—Included Offenses.**

1.   The general rule is that an indictment for murder in the first degree necessarily involves all other grades of homicide which the evidence tends to establish.

[As to indictment or information for homicide, see note in 3 Am. St. Rep. 279.]

**Abortion—Elements.**

2.   Procuring an unlawful abortion upon any woman always involves an assault in law, even when it is done with her consent and connivance, because no one can consent to an unlawful act.

**Homicide—Statute—Abortion.**

3.   The Oregon statute, making homicide from unlawful abortion manslaughter, has not created a new crime, but merely reduced the grade of the offense at common law by changing the punishment from death to imprisonment in the penitentiary.

**Homicide—Indictment—Abortion.**

4.   An indictment for murder in the first degree is sufficient to sustain a conviction for homicide, committed in an attempt to procure an abortion.

**Homicide—Indictment—Unknown Means.**

5.   An indictment for murder by means unknown to the grand jury is good.

**Homicide—Indictment—Proof and Variance.**

6.   An indictment for murder by means unknown to the grand jury will sustain conviction in a case where accused was conclusively

---

*On admissibility of declarations of one upon whom an abortion has been committed against others charged with complicity therein, see notes in 35 L. R. A. (N. S.) 1084; L. R. A. 1916C, 570.

On homicide in commission of or attempt to commit abortion, see notes in 63 L. R. A. 902; 49 L. R. A. (N. S.) 580.      REPORTER.

proved to have either murdered a girl outright or killed her in an attempt to procure an abortion.

### Homicide—Harmless Error.

7. Where it appeared that accused either killed a girl outright or in an attempt to procure an abortion, but there was no evidence that an operation was necessary to preserve the life of the mother or child, any error in failing to point out the statutory exceptions or justification for such an operation was harmless.

### Homicide—Evidence.

8. Evidence of the identity of deceased, whose remains were found burned in a barn, of previous preparation by accused for abortion, and of footprints of accused and the horse he was riding, etc., *held* to sustain a conviction for manslaughter by direct killing or producing an abortion on deceased.

### Criminal Law—Harmless Error.

9. Admission of testimony of a girl friend of deceased that she (deceased) had told her that she would stay home because accused was coming to see her that evening was not prejudicial, where without objection there remained in the record, upon answer to cross-examination, a statement of a state's witness that deceased had told some girls that she had received a letter from accused, and could not go out with them because accused was coming to see her that evening.

### Homicide—Evidence—Declarations of Deceased.

10. Declarations of deceased, made in a perfectly natural manner, on the evening of the homicide, that she was about to meet accused were admissible to show that what she intended to do was probably done, and did not violate Section 705 or Section 727, subdivision 4, L. O. L., as to declarations, or any other Code section.

### Criminal Law—Evidence—Competency.

11. If evidence is competent for one purpose, it cannot be rejected merely because it is not competent for another purpose, although an instruction, limiting its effect, is proper.

### Criminal Law—Evidence—Declarations of Third Persons.

12. Evidence of declaration of third person, tending to show he committed the homicide, is inadmissible.

### FROM DISSENTING OPINION.
### Criminal Law—Evidence—Real Evidence.

13. The admission in evidence of material objects or allowing inspection of the same, whether offered in evidence or not is within the discretion of the court.

### Criminal Law—Evidence.

14. The refusal six months after the homicide to allow the jury to inspect the feet of a horse upon whose tracks the prosecution relied was not an abuse of the court's discretion as to admitting in evidence material objects or allowing inspection of the same.

## From Douglas: GEORGE F. SKIPWORTH, Judge.

In Banc.    Statement by Mr. Justice McBride.

The defendant, Roy A. Farnam, was indicted for murder in the second degree, the charging part of the indictment being as follows:

"He, the said Roy A. Farnam, on the eighth day of December, A. D. 1914, in the said county of Douglas, State of Oregon, then and there being, did then and there wrongfully, unlawfully, feloniously, purposely and maliciously kill Edna Morgan in some manner and by some means unknown to the grand jury; and so he, the aforesaid Roy A. Farnam, did then and there in said county and state commit the crime of murder in the second degree by feloniously, purposely and maliciously killing the aforesaid Edna Morgan, contrary to the statutes in such cases made and provided, and against the peace and dignity of the State of Oregon."

The jury returned a verdict, finding defendant guilty of manslaughter. The court, among others, gave the following instructions:

"Now, directing your attention to manslaughter. The statute provides that if any person shall, in the commission of an unlawful act, or lawful act without due caution or circumspection, involuntarily kill another, such person shall be guilty of manslaughter. * * If you find beyond a reasonable doubt that the defendant, while in the commission of an unlawful act, if he did commit an unlawful act, on the night that Beamer's barn burned in Douglas County, Oregon, involuntarily killed Edna Morgan, then it would be your duty to find the defendant guilty of manslaughter. I instruct you that if you find beyond a reasonable doubt that the defendant by any means committed an abortion upon the person of Edna Morgan, then I instruct you that such act, if such act took place, was an unlawful act, and if you find beyond a reasonable doubt that the defendant, on the night that Beamer's barn burned in Douglas County, Oregon, committed an abortion upon the person of Edna Morgan, and if you further find beyond a reasonable doubt that Edna Morgan was

killed as a result of such abortion, if such abortion was committed, then it would be your duty to convict the defendant of manslaughter.''

The defendant by his counsel excepted generally to the instructions in regard to manslaughter. From the judgment of the court upon the verdict the defendant appeals here. The points relied upon in the appeal appear in this opinion, and in the opinions of Mr. Justice HARRIS, concurring, and of Mr. Justice BURNETT, dissenting.                                    AFFIRMED.

For appellant there was a brief and an oral argument by *Mr. William W. Cardwell.*

For the State there was a brief over the names of *Mr. George M. Brown,* Attorney General, *Mr. George Neuner, Jr.,* District Attorney, and *Mr. Dexter Rice,* with oral arguments by *Mr. Brown* and *Mr. Neuner, Jr.*

MR. JUSTICE McBRIDE delivered the opinion of the court.

1-4. For the reasons stated in the opinion of Mr. Justice HARRIS, we are satisfied that the defendant was guilty of an unlawful homicide, and that he either shot deceased, which would be deliberate murder, or killed her in the attempt to commit an unlawful abortion upon her, which, under our statute, would be manslaughter. The general rule in this state is that an indictment for murder in the first degree necessarily involves all other grades of homicide which the evidence tends to establish: *State* v. *Ellsworth,* 30 Or. 145 (47 Pac. 199); *State* v. *Magers,* 35 Or. 520 (57 Pac. 197); *State* v. *Crockett,* 39 Or. 76 (65 Pac. 447); *State* v. *Megorden,* 49 Or. 259 (88 Pac. 306, 14 Ann. Cas. 130). These decisions would seem to foreclose the

contention of defendant's counsel here so far as this branch of the case is concerned, and the case of *People* v. *Olmstead,* 30 Mich. 431, which suggests a contrary view, we believe to be based upon an erroneous distinction between that class of homicides known as voluntary homicides, in which violence, assault and trespass are involved, and involuntary homicides caused by the doing of an unlawful act, but with no intent that it should result in death. As observed in *People* v. *Olmstead,* the defect is not one of pleading, but of evidence. If it appears, therefore, from the evidence that the defendant, in attempting to commit an abortion upon the deceased, assaulted her, this brings the case within the ordinary rules of manslaughter. Procuring an unlawful abortion upon any woman always involves an assault in law, even when it is done with her consent and connivance, because no one can consent to an unlawful act. While as between the parties an unlawful act may sometimes be condoned, it is not within the power of any person to waive the violation of the laws of the country. Instances of this are found in cases of mutual agreements to fight, wherein it is held that both parties to such a conflict are guilty of assault and battery, and that each may recover damages from the other for injuries inflicted: 5 C. J. 630, and cases there cited. If procuring an unlawful abortion, therefore, is an assault, the offense comes within those involuntary killings by misdirected violence which constitute manslaughter. At common law the producing of an unlawful abortion resulting in the death of the mother was murder by violence. Our statute by making the offense manslaughter has not created a new crime, but has merely reduced the grade of an old offense by changing the punishment from death to imprisonment in the penitentiary. Thus, in

Chitty's Criminal Law, Vol. 3, p. 800, we find the form of an indictment for procuring an abortion, or rather a series of abortions, the fourth count of which we quote, omitting only formal and archaic allegations:

"And the jurors, etc., do further present that the said E. F. afterward, etc., in and upon A. E. * * [she] then and there being big and pregnant with a certain other child, did make another violent assault, and her the said A. E. and then and there did violently beat, bruise, wound, and ill treat, so that her life was thereby greatly despaired of, and then and there violently, wickedly, and inhumanly pinched and bruised the belly and private parts of the said A. E., and a certain instrument called a rule, which he, the said E. F., in his right hand then and there had and held, up and into the womb and body of the said Anne, then and there violently, wickedly, and inhumanly, did force and thrust with a wicked intent to cause and procure the said A. E. to miscarry and to bring forth the said child, of which she was so big and pregnant, as last aforesaid, dead," etc.

Another count in the same indictment for another abortion attempted upon the same woman charged the defendant with an assault by administering drugs with intent to produce an abortion, and feloniously and of malice aforethought to murder said child. So it is said in Hale's Pleas of the Crown, p. 429:

"If a woman be with child, and any gives her a potion to destroy the child within her, and she takes it, and it works so strongly that it kills her, this is murder, for it was not given to cure her of a disease, but unlawfully to destroy her child within her, and, therefore, he that gives a potion to this end must take the hazard, and if it kills the mother, it is murder, and so ruled before me at the assizes at Bury in the year 1670": See, also, *Margaret Tinckler's Case,* 1 East's P. C. 354.

From these precedents I conclude that at common law the act of producing an abortion was always an assault, for the double reason that a woman was not deemed able to assent to an unlawful act against herself, and for the further reason that she was incapable of consenting to the murder of an unborn infant; and, as already shown, our statute, while it has reduced the grade of the homicide from murder to manslaughter, has not taken away any other element of the offense. This being true, the death of the deceased, occurring by reason of a double assault made both upon her and upon her unborn child, comes clearly within the category of those degrees of felonious homicide by violence which begins with murder in the first degree. The practice of allowing convictions for manslaughter upon indictments for murder in the first degree is no mere creature of our statute, but is as old as the common law.    Thus in 1 East's P. C. 340, printed in 1716, we find the following:

"In most cases where justice requires that a man should be put upon his trial for killing another, it is usual (and proper, if there be any doubt) to charge him in the indictment for murder, because in many instances it is a complicated question; and no injury can thereby happen to the individual at all comparable to the evil example of a lax administration of justice in this respect; for the verdict and judgment will still be adapted to the nature of the offense, such as it appears upon the evidence."

In the appendix to Blackstone's Commentaries, Vol. 4, is found a form of judgment upon a verdict of manslaughter upon an indictment charging the defendant with willful murder.  From all of these authorities we deduce the principle that procuring an unlawful abortion by any means is always in the eye of the law an assault, both upon the woman operated upon

and upon the unborn child, and that the one who, in producing such abortion, kills the mother stands in no different relation to the law from a person who, in an attempt to shoot A, shoots wild and kills B, except in so far as Section 1900, L. O. L., has modified the punishment. It seems to be the general rule that an indictment in the ordinary form for murder in the first degree is sufficient to sustain a conviction for a homi-- cide committed in the attempt to perpetrate a felony: *Titus* v. *State,* 49 N. J. Law, 36 (7 Atl. 621); *Commonwealth* v. *Flanagan,* 7 Watts & S. (Pa.) 415; *People* v. *Giblin,* 115 N. Y. 196 (21 N. E. 1062, 4 L. R. A. 757); *State* v. *Covington,* 117 N. C. 834 (23 S. E. 337), and many others. Numerous states in which the courts have held as above have statutes similar to ours in relation to the certainty with which the circumstances of the crime shall be set forth in the indictment. The following is a *résumé* of some of the opinions on this point:

In *State* v. *Foster,* 136 Mo. 653 (38 S. W. 721), the court says:

"The indictment charges that the murder was committed in the attempt to rob Atwater, but such statement was wholly unnecessary, as the indictment may be drawn in common form, and then, when proof is made that the homicide was done in the perpetration of a robbery, this proof, being made, is tantamount to that premeditation, deliberation, etc., which otherwise are necessary to be proven, in order to constitute murder in the first degree."

In *Titus* v. *State,* 49 N. J. Law, 36 (7 Atl. 621), the indictment contained three counts, of which two are considered in the opinion, one being:

"And the grand inquest aforesaid, upon their oaths aforesaid, do further present that the said James J. Titus, on the said eighth day of April, in the year

aforesaid, at the said town of Hackettstown aforesaid, in said county, and within the jurisdiction aforesaid, in and upon one Matilda Smith, in the peace of God and this state then and there being, did commit rape, * * and in committing rape in and upon her, the said Matilda Smith, did kill the said Matilda Smith," etc.

This count was held bad. Another count read as follows:

"In and upon one Matilda Smith, in the peace, etc., did make an assault, and her, the said Matilda Smith, then and there feloniously, willfully and of his malice aforethought, did kill and murder, contrary," etc.

From the opinion I quote as follows:

"At the trial the jury was instructed that if it appeared that the killing was perpetrated by the defendant in committing, or in attempting to commit, a rape upon the woman, he should be found guilty of murder in the first degree, without reference to the question whether such killing was willful or unintentional. The position of the counsel of the defendant upon the point is that, as there is no special count charging that the death of the woman occurred in the attempt to commit or in the commission of a rape upon her, the law will not permit such fact to be proved for the purpose of aggravating the killing, if it was unintentional, into the crime of murder in the first degree. This contention is based upon the sixty-eighth section of the Crimes Act, which declares that, 'All murder that shall be perpetrated by means of poison, or by lying in wait, or by any other kind of willful, deliberate, and premeditated killing, or which shall be committed in perpetrating or attempting to perpetrate any arson, rape, etc., shall be deemed murder in the first degree and that all other kinds of murder shall be murder in the second degree.' The argument urged in support of the position that a special count was indispensable whenever the state relied on any of the statutory particulars connected with the killing to intensify such killing into murder, was that, as the act created and defined the offense, every constituent of the crime embraced in

such definition must be stated in the indictment. But this proposition cannot be sustained, for it has been conclusively settled by the Court of Errors in this state, in the case of *Graves* v. *State,* 45 N. J. Law, 205, Id., 358 [46 Am. Rep. 778], that the section relied on did not create any new crime, but 'merely made a distinction, with a view to a difference in the punishment, between the most heinous and the less aggravated grades of the crime of murder.' This decided case seems to us directly in point, for in that instance, the indictment being in the abbreviated form given by the statute, it was insisted that as such form did not embody the statement that the alleged killing was 'willful, deliberate and premeditated,' the pleading was insufficient, as it did not appear that murder, within the statutory definition of the crime, had been committed. The objection was overruled and the indictment was sustained, and it is obvious that if it be not necessary to set out in the count that the alleged killing was 'willful, deliberate and premeditated,' which is one of the categories of murder mentioned in the section, it cannot be necessary to show that the killing was in the commission of a rape, which is another of the categories of the same section.''

In the case of *State* v. *Averill,* 85 Vt. 115 (81 Atl. 461, Ann. Cas. 1914B, 1005), defendant (called respondent in the opinion) was indicted for murder in the first degree. Defendant objected to an instruction upon involuntary manslaughter. The court says:

'' 'A lawful act, done in an unlawful or negligent manner, is in law an unlawful act' (*State* v. *Dorsey,* 118 Ind. 167, 10 Am. St. Rep. 111, 20 N. E. 779); and we think the testimony given by the respondent tended to show that the shooting, though unintentionally done, was the result of negligence by her in handling the gun, indicating on her part a carelessness or recklessness incompatible with a proper regard for human life, which, if established, would in law render her guilty of involuntary manslaughter. * * If an indictment so drawn sufficiently informs the accused of the cause and

nature of the accusation against him for murder, it must follow that it sufficiently informs him of the cause and nature of any offense included within that of murder, for the greater contains the less."

Elsewhere in the same opinion is found the following statement:

"Thus it was established at common law, that a person indicted for the murder of another upon malice prepense may be found guilty of manslaughter, because it does not differ in kind or nature of the offense, but only in the degree—not in substance of the fact, from murder, but only in the ensuing circumstances, a variance as to which does not hurt the verdict."

The court held in the case of *People* v. *Pearne,* 118 Cal. 154 (50 Pac. 376):

"The indictment charged that the defendant 'did deliberately, willfully and unlawfully kill one Ellen Dogan.' The evidence indicated that the killing was not done deliberately and willfully, but accidentally and unintentionally, and the jury, taking that view of the matter, in the light of the instructions of the court as to the law, found the defendant guilty of 'involuntary manslaughter.' It is now insisted that the indictment charges the crime of voluntary manslaughter, and that under such indictment a verdict of involuntary manslaughter constitutes a fatal variance. * * This position is not well taken. If this indictment had simply charged an 'unlawful killing,' without malice, it would have charged the crime of manslaughter of both kinds, voluntary and involuntary. * * Yet it has always been held that upon an indictment charging murder, a conviction for manslaughter was proper. In other words, when an indictment charges murder, it also charges manslaughter. An indictment laid for murder charges an intentional killing; yet, under the criminal practice and procedure in this state, there is no doubt but that a verdict of involuntary manslaughter would find support in such a pleading. This is so because involuntary man-

slaughter is the 'unlawful killing of a human being,' and such crime is always included in * * murder."

In *Tharp* v. *State,* 99 Ark. 188 (137 S. W. 1097), the court gave this instruction:

"The jury cannot convict of murder unless the evidence shows a killing in the manner mentioned in the indictment, but may convict of a lower degree of homicide, if the evidence warrants a conviction for a lower degree, whether the killing was done in the manner mentioned in the indictment or not."

The jury found defendant guilty of involuntary manslaughter, and the judgment was affirmed: *White* v. *State,* 121 Ga. 191 (48 S. E. 941), is to the same effect. The case of *State* v. *Moore,* 129 Iowa, 514 (106 N. W. 16), wherein the indictment was for murder and the verdict manslaughter under an instruction by the court as to gross negligence, was affirmed. In *Conner* v. *Commonwealth,* 13 Bush (Ky.), 715, the court says:

"Both voluntary and involuntary manslaughter are included in the crime of murder, and one indicted for murder may be convicted of murder or either of the degrees of manslaughter."

In *Re Somers,* 31 Nev. 531 (103 Pac. 1073, 135 Am. St. Rep. 700, 24 L. R. A. (N. S.) 504), the court says:

"While we are duly impressed with the fact that involuntary manslaughter does not contain the same heinous ingredients necessary to make up the crime of murder in the first or second degree, or of voluntary manslaughter, yet we are clearly of the opinion that, it being an unlawful transgression of the law against homicide, it may properly be considered a lesser degree of homicide, and that a jury * * may properly return in proper cases a verdict of involuntary manslaughter": *State* v. *Tucker,* 86 S. C. 211 (68 S. E. 523).

In *State* v. *Whitney,* 54 Or. 438 (102 Pac. 288), the defendant was indicted for manslaughter under Section 1898, L. O. L., referred to in the opinion as Section 1746, B. & C. That portion of the charge in the indictment which was deemed material by the court alleged that the defendant "did feloniously and voluntarily kill one Mabel Wirtz by voluntarily giving and administering unto her, the said Mabel Wirtz, on the fourteenth day of March, 1908, in the said county and state, one suppository containing bichloride of mercury," etc. Mr. Justice EAKIN, in discussing the case, says:

"It becomes important to determine whether it does state acts constituting involuntary manslaughter. The allegation in the indictment is 'By voluntarily giving and administering unto her, the said Mabel Wirtz, on the fourteenth day of March, 1908, in said county and state, one suppository containing bichloride of mercury, a deadly poison, from the effects of which deadly poison, so given and administered, she, the said Mabel Wirtz, became mortally sick, * * and died.' This allegation does not state facts disclosing an unlawful act, or a lawful act done without due caution and circumspection, or any act of criminality. It is not necessary to allege malice or intent to kill. The criminal element consists in doing the unlawful act, without any intention to take the life of decedent, or do her great bodily harm. It is therefore necessary that the indictment disclose that the act causing death was an unlawful act. * * Counsel for the state in his brief cites authorities to the effect that poison negligently administered, or administered with an evil purpose, in the event death follows, is manslaughter. However, it is not alleged that the poison was administered without due caution or circumspection, nor is an evil purpose alleged, and therefore these authorities do not aid the state. Where the charge is murder by poisoning, as is the case in some authorities cited, the indictment charges an intent to murder, thus disclosing

an unlawful act, or evil purpose, and will support a verdict of involuntary manslaughter under Section 1746, B. & C. Comp. This was expressly held in *State v. Ellsworth,* 30 Or. 145 (47 Pac. 199), but in the present case the indictment is confined to a charge of a violation of Section 1746, without alleging an unlawful act.''

In the case of *State* v. *Ellsworth,* cited in the above excerpt, the charge in the indictment was murder by poisoning, and this court held that under such an indictment the court could properly instruct the jury that they might return a verdict of involuntary manslaughter caused by culpable negligence. The authorities above cited indicate that where the indictment charges murder and the proof shows an unlawful, involuntary killing, the defendant may be convicted of such grade of felonious homicide as the evidence seems to warrant.

5, 6. Another reason why the case at bar should be distinguished from the Michigan case is that an indictment in this state is good as to the means by which the offense was perpetrated if it shall appear from the evidence that such means were unknown to the grand jury. This form of indictment is sanctioned by our Code: See form No. 1, p. 1010, Vol. 1, L. O. L., and forms Nos. 5 and 6, p. 1011, L. O. L.; Bishop, Cr. Proc., §§ 495, 553; *Waggoner* v. *State,* 155 Ind. 341 (58 N. E. 190, 80 Am. St. Rep. 237); *Edmonds* v. *State,* 34 Ark. 720. In the latter case it is said:

''No doubt the mode or instrument of death, if known to the grand jury, or if it can be ascertained by them, should be alleged in the indictment. * * But this rule must not be carried so far as to furnish a shield from punishment, where it is plain that a crime has been committed. * * It will be seen from the evidence in this case that if the means of death could not

have been so alleged, the crime might have gone unpunished.''

So here. It is conclusively proved that the defendant lured this poor, 15 year old child into a barn remote from human habitation, and that he either murdered her outright, or, in an attempt to produce an abortion to protect himself from the consequences of his own lust, so dealt with her as to bring about her death. The evidence was such that reasonable men, while they might agree as to the fact that an unlawful homicide had been committed (and I cannot see how reasonable men could come to any other conclusion), might well differ as to the means by which, or the intent with which, the offense was committed. Under such circumstances it was eminently proper for the grand jury to charge that it was committed by means to the grand jury unknown.

There is a further reason why it was unnecessary to charge that the offense was committed in an attempt to produce an abortion, and that is this: In my judgment the statute was directed at that class of abortions only wherein the actual consent of the woman, as distinguished from legal consent, is obtained. I take it that if a person should forcibly seize a woman and attempt against her consent to produce an abortion upon her, or should secretly, with the same design, introduce drugs into her food, and by reason of either of these attempts the woman should be killed, Section 1900 of the Code would not apply, but that he would be guilty under Section 1895 or Section 1898, as the facts might appear. The deceased, a poor, motherless child of 15, was incapable of consenting to an assault upon herself, or upon her unborn child. It is sickening to speak of her consenting to the act. It was as much a forcible act as though some scoundrel had met her

82 Or.—15

upon the road, and, knowing her condition, had seized her, and in the attempt forcibly to bring about a miscarriage had killed her. I am aware of the common-law rule in regard to rape and the defilement of children, but those were exceptions to the general rule in regard to consent which, fortunately, an improved sense of decency has removed by statute, and which should not be extended beyond the limits fixed by a generation less scrupulous than ours in regard to the chastity of children. Upon the whole I am of the opinion that the offense is included in that class of manslaughters by violence that are embraced by the general charge of murder.

7. It is urged that, conceding that manslaughter committed in producing an abortion can properly be considered in a case where the indictment charges murder, the charge of the court in this instance was erroneous, because the court failed to point out the exceptions mentioned in the statute. If there was error in this respect, it was harmless, because there was not the slightest testimony that the operation was necessary to preserve the life of the mother or the child. On the contrary, the evidence indicated that it was wholly unnecessary, and that, if performed at all, it was for the base and sordid purpose of enabling defendant to escape the consequences of his own unlawful act; but there was no error. Where there is no testimony whatever to bring a case within an exception in the statute, the court is not required to charge in relation to such exception. This exact question arose in the case of *Weed* v. *People,* 56 N. Y. 628. The opinion is short, and we give it in full:

"Plaintiff in error was indicted for procuring an abortion, by administering drugs causing the death of the mother. The questions above stated were raised upon the trial, and were disposed of as there stated.

The court charged, among other things, that if the jury found an abortion had been committed upon deceased, or an attempt had been made causing her death, and that the prisoner was connected with it, they must convict. This was excepted to. It was insisted that the charge was erroneous, as the jury were instructed to convict, notwithstanding they found that the production of the miscarriage was necessary to preserve the life of the deceased, in which case it was not criminal. Held, that the charge was proper, as the evidence showed clearly the absence of any necessity, and no evidence whatever was given tending to show such a necessity, and that therefore there was nothing warranting the submission of that question to the jury.''

Error is predicated upon the refusal of the court to permit an inspection of the feet of the horse which the state claimed was ridden by the defendant on the night of the homicide, and also upon the refusal of the court to permit evidence of the declarations of third parties, tending to show that they had committed the homicide. We all concur with Mr. Justice BURNETT in holding that there was no reversible error in either ruling.

For the reasons stated by Mr. Justice HARRIS we are of the opinion that there was no error in the admission of the testimony of Mabel Barton as to statements made to her by deceased on the evening preceding the homicide.

We also concur with Mr. Justice HARRIS in holding that the evidence as to the *corpus delicti* was competent and sufficient.

The judgment of the Circuit Court is therefore affirmed.                     AFFIRMED.

MR. JUSTICE HARRIS delivered the following concurring opinion:

8. The scene of the tragedy as told by the record is laid in Cow Creek Valley. The places to be kept

in mind are the Farnam and Morgan residences and the Beamer barn. The defendant lived with his parents, a sister and a brother, Lester Farnam, on a farm about 12 miles east of the town of Glendale. Edna Morgan resided with her father and a younger sister, Esther Morgan, on a farm about 5 miles west of the Farnam place, and about 7 miles east of Glendale. The Beamer barn is located about three quarters of a mile west of the Morgan home, or about 5¾ miles west of the Farnam place. A public road runs past the Farnam house, extends west down the valley by the Morgan residence, and then continues on past the Beamer barn to Glendale. The Beamer barn was located about 50 feet south of the road. The building had been erected for a dwelling-house, and afterward converted into a barn. The barn may be described as having a main part and a shed, with the main part facing the road and the shed in the rear. When the main part was changed from a dwelling-house to a barn the ceilings and partitions were taken out, so that there was no loft. Hay was kept in the main part, and on December 8th, 7 or 8 tons were spread on the floor to a depth of between 3 and 4 feet. The southwest half of the shed was used for cows, while horses were kept in the southeast portion. There were only two entrances to the barn. One was on the west side close to the south corner, and opened into the place where the cows were kept, and the other entrance was on the east side and led to the horses. A person could reach the main part by entering either one of the two doors. On the night of December 8th, the entrance to the horses had two bars across it, so as to prevent the horses from getting out, but the other door was left open, so that the cows could come and go.

About half-past 1 o'clock on the morning of December 9, 1914, H. H. Beamer, whose residence is 720 feet from the barn, discovered that his barn was on fire. He went down to the barn, and "stayed until it fell out, and burned down pretty well, just like a pile of hay burning." Beamer and four other persons who were at the barn then went to bed again. About 7 o'clock in the morning Beamer returned to the fire and "saw the remains of a body in the ashes, still burning." The neighbors were immediately notified, and appeared upon the scene, and they then "saw it was the body of a lady," because "there was some hairpins laying right across, kind of back of the skull. There was two right along here, and there was one long corset stay, and one or two small ones curled up next to the long one, and then there was some more laying right side of it." The remains were found lying next to a sill, and the body was permitted to burn until about 10 o'clock that morning when, acting on the advice of the coroner, the fire was extinguished with water. When the fire started, the body was evidently on the hay inside the main part of the barn, because the remains were found at a place which would have been near the south side, but within the main part of the barn. The arms and the legs were, for the most part, consumed by the fire, and while the body had been burned beyond recognition, there was yet enough left undubitably to establish that it was the charred, burned and baked remnant of a once female human being. Between the thighs, and to some extent protected by them and the lower parts of the body from the fire, lay a fetus, which the medical men said had reached about the fifth month of its development. The verdict of the jury was evidently predicated upon the theory that the death of

Edna Morgan resulted from an abortion produced by the defendant.

At the very outset the defendant contends that "there is no proof of the *corpus delicti* from which the court or the jury can say that the body found in Beamer's barn was the body of the missing girl at all," and, further, that "there is not one circumstance from which it can be said that defendant caused the death of Edna Morgan at all, in the commission of an unlawful act or otherwise." It therefore becomes necessary to examine the evidence which was submitted to the jury.

A motive can be ascribed to Roy Farnam which would have been more relentlessly pursuing and more fearfully pressing upon him than upon any other living person. Roy Farnam is an unmarried man, and was about 23 years of age. Edna Morgan would have been 15 years old on December 9, 1914. Their acquaintance with each other dated from about Christmas, 1913; acquaintanceship grew into friendship, and friendship apparently ripened into love; for, commencing with the latter part of June or the first part of July, no other boy or young man escorted Edna Morgan to dances, parties and literary entertainments except Roy Farnam. The defendant admitted that so far as he knew he was the only person who kept company with Edna Morgan. She was a frequent visitor at the Farnam house. It was not unusual for her to be there as often as two or three times a week, and the longest period between her visits was about three weeks. More than once she remained at the Farnam home overnight, and the next day was taken home by Roy. On the Saturday preceding the day of her disappearance she stayed overnight with the Farnam family, and was escorted home the next evening by

the defendant.   J. J. Pollock testified that in the latter half of June, 1914, he saw the defendant and Edna come out of the Morgan barn, and observed Roy "brushing her clothing and her hair."   Ira Lewis said that on the night of July 1, 1914, between 11 and 12 o'clock he saw the defendant and Edna in a compromising position.   Rice Wilson and George Barton testified that on November 8th, they saw Roy and the girl in an unmistakable position.   In September, 1914, Mrs. Ella McGee made a one-piece gingham dress for Edna with the waist and skirt sewed together, but so constructed that a belt could be worn if desired. Mrs. McGee found the waist measurement to be 26 inches, and made a belt 28 inches long, so that it had a 2-inch lap.   This witness testified that when taking the measurement for the dress she noticed the development of the bust, "more than I had noticed her before.   I remarked about it."   Edna wore this belt only a few times, and soon discarded it.   Margaret Wilson called at the Morgan home on the afternoon of December 8th, and, having noticed the belt on the table, picked it up and tried it on Edna, and found it to be 2 or 3 inches too short.   Her father, R. M. Morgan, stated that Edna had not gone to basket-ball games for probably a month prior to her disappearance.   Mrs. Emma Herald told the jury that a few days before Thanksgiving she noticed that the girl "looked too large to be normal," and that the impression made upon her was so strong that she spoke to her husband about her suspicions.   Verna McGee explained some observations which she made at a basket-ball game about a month prior to December.   Helen Ferbrache and Margaret Wilson stated that Edna had worn a certain short blue coat to school, and that they had not seen her with the coat off in school for a long time.

There was ample evidence to warrant the jury in believing that Edna Morgan was pregnant, and that Roy Farnam was the author of her condition.

Edna Morgan was home in the sitting-room during the evening of December 8th until about 10 o'clock, when, according to the testimony of her father, he saw her alive for the last time as she left that room and stepped out into the hall. The father does not know whether she went upstairs to the bedroom which she occupied with her sister, although he supposed at the time she was going to bed. Esther Morgan retired about 8:30 and never saw Edna alive after that time. The next morning the father and Esther arose at the usual hour, and it was discovered that Edna was missing. When Edna left the sitting-room a cap and a raincoat belonging to Esther and the blue short coat belonging to Edna were hanging in that room, but on the morning of the 9th those articles were gone. Three medical witnesses expressed the opinion that the remains were those of a young person, basing their conclusion on the appearance of a wisdom tooth, the condition of certain sex organs, and the upper end of the femur. Physicians also stated that the expulsion of the fetus resulted from an operation with the hand or an instrument, and that death probably occurred after the birth.

About 8 o'clock on the morning of the 9th, before any women had come from the road to view the fire, tracks, apparently made by a woman, were discovered leading from the center of the road about a rod east of a gap or bars in the fence, "right straight toward the gap" in front of the Beamer barn "in toward" the barn. These tracks were indistinct except two. One was close to the gap or bars, but within the right of way of the road, and the other was inside the in-

closure and a few feet from the bars, through which
the person making the tracks had evidently gone.
Each of the two plain tracks appeared in cow manure.
The imprints were made by a No. 3 shoe, and appar-
ently the shoe had a good heel. Edna Morgan wore
a No. 3 shoe, and the shoes worn by her that night
were comparatively new. The length of the two
tracks corresponded with the length of one of her old
shoes. Moreover, the very places where the two plain
tracks were found would indicate that the woman mak-
ing those tracks did so in the night, when she could not
plainly see where she was stepping.

On the 15th of the preceding October the father pur-
chased a corset from A. H. Henson, a merchant in
Glendale. Edna wore this corset that night, because
Esther said that she could feel it when she had her
arms around the sister while playing with her that
evening. The corset could not be found in the Morgan
home the next morning. Corset stays and supporter
buckles were found with the burned body. A. H.
Henson never carried or sold any corsets except W. T.
corsets. Indented on the supporter buckles used with
the W. T. corsets are the letters and figures: "Pat. 11.
2. 09." These letters and figures appear on buckles
found with the body, and, moreover, the buckles that
had been in the fire were exactly like those used on
W. T. corsets. There are four supporter buckles on
the sample W. T. corset received in evidence. Four
buckles were found at the Beamer barn. The metallic
part of three buttons or grips used in connection with
the supporters were panned out from the ashes, and
they were exactly like the same part of the buttons
or grips found on the sample corset; and, finally, as-
surance is made doubly sure from the circumstance
that the two clasps, which were found with the body,

and are made to fit each other down the full length of the corset, are the exact counterparts of the two clasps on the sample corset.

On December 8th Edna wore the dress that Mrs. Ella McGee had made for her in September. The material and buttons for that dress were supplied by Edna. Mrs. McGee says that Edna furnished her with three large old-fashioned pearl buttons, which the girl said had been used by her mother when living, and that she had no other buttons like them. Those three buttons were sewed on the skirt of the gingham dress. The buttons had "an oval shaped ring carved" in them, and that is what caused Mrs. McGee to "take particular notice to it." One whole button and some pieces were taken from the place where the body lay, and Mrs. McGee testified that the whole button was "exactly like those I put on the dress." There was also some testimony that Edna's front teeth had been shortened by decay, and the record discloses some evidence tending to show that the front teeth of the skull found in the Beamer barn were short. Harry Wilson was at the barn soon after the body was discovered, and he saw the form of a corpse—

"with the head lying in the barn, about the center of the barn. She was lying on her back, and the body-part of the body from the hips up was in this direction, and the corset was one side of it, had fallen off on the sill. She was laying partly on the sill in the center of the barn, and the side that was laying on the sill was still burning. The clothing had burned away, and her form was lying partly on the side; it lay on the corsets, and they burned on the ground, but on the other side they were standing up, held up by the flesh. I saw also the hair of her head lying there, and the hairpins, and I saw the bones of the arm, and her arms, and the form of her legs. Saw also that she wore something of waterproof, you could see the cuffs

—her arms lay this way—and you could see the cuffs of both sleeves; they looked heavier than the bottom of the dress; you could see the cuffs, and three or four inches of the balance. It looked like it had been waterproof cloth. And I could see the bones of the arms laying up this way. And the legs down to the feet. They were badly burned. You could see the form of the legs and the form of the arms."

Additional evidence appears in the record relative to the appearance of the ashes left by the burning of the wearing apparel. Hairpins and shoe buttons with wire fasteners were found with the body. Mrs. Florence Dewey told the jury that she was up the morning of the 9th on account of her sick mother, who was living in the Eliff house, 810 feet from the Beamer barn; that she stepped out on the front porch to observe the condition of the weather, and noticed a light in the Beamer barn, and "as I turned to go into the house, * * I saw the reflection; I knew the barn was afire, and when I walked a step or two, and went into the door, * * I stopped to look back through to the fire, and as I did so I heard a gun shot at that barn. Some small caliber gun." Underneath the body Harry Wilson found "three pieces of flat lead; it had melted and run into the crevices."

Testimony concerning oil of tansy, logwood tea, echinacea, a shoe track, and horse tracks are largely relied upon to connect the defendant with the death of the girl. Evidence concerning a letter written by the defendant and received by the deceased was an important feature of the trial. Oil of tansy is a poison and an abortive agent. Logwood tea is poisonous. Echinacea is used as a blood medicine and to treat blood poisoning. Dr. D. A. Forbes of Canyonville, says that the defendant came to him on September 2, 1914, and told him:

"That he had a cousin, a young lady who had been out with a young man, and she had gotten into trouble, and wanted to know if I would take the case, and I told him I would at term. That is the expiration of the period of gestation. He wanted to know if I could not do something before that time—they did not want to let the case run—and I questioned him with regard to the time, and he said it was two months, and I told him it was not my practice at all to interfere with anything of that kind. And he wanted to know of me, when he found that I would not take the case at all, he wanted to know what I could advise, and I told him I would not advise anything, to begin with, and he asked me then with regard to some drugs, and I told him that anything that he could use in that line was of a poisonous nature, and I would advise him to not fool with it."

The defendant also spoke to Dr. Forbes about the use of oil of tansy with cattle, and inquired about using logwood tea and oil of tansy. H. E. Jeffries gave some extract of logwood chips to the defendant, who said that he wanted it for a girl, explaining the reason. About three days afterward Roy secured more extract of logwood chips, and at that time told Jeffries that:

"He had inquired of a doctor in Canyonville if that stuff was any good or not, and the doctor told him that the stuff was poison, and any poison would do that, and to be careful."

Roy subsequently told the witness that the "stuff is no good."

In September, 1914, the defendant asked J. E. O'Neil, a druggist in Canyonville, for oil of tansy, but the latter had none. On September 6, 1914, and again on September 20th following, B. L. Darby sold oil of tansy to Roy Farnam. On December 10th, a bottle labeled echinacea and a bottle containing oil of tansy were found in the Morgan home in a bureau drawer

used by Edna.   The sheriff testified that he exhibited the oil of tansy bottle to the defendant, and the latter "said he got it at Darby's drug-store in Glendale." Mrs. Farnam stated that "we had a bottle just exactly like this" bottle of echinacea.   R. M. Morgan testified that he had never had oil of tansy or echinacea about the house.   The defendant admitted upon the witness-stand that he was getting the extract of logwood chips for the purpose of an abortion, but claimed that he was getting them for another man.

Thirteen boards fell out of the gable end of the shed where the cows were kept, and were not consumed by the fire, but lay upon the ground undisturbed until turned over in the search for tracks.   A shoe-print was found in the mud about 3 feet from the entrance on the west side of the barn, and indicated that the person who made the track had stepped out of that entrance.   This track corresponded in every particular with a shoe worn by Roy Farnam on December 8th.   Large corrugated hobnails had been driven into the sole of his shoe, and a single row of small nails appeared around the edge of the sole.   Similar hobnails, as well as small nails, had been driven in the heel of the shoe.   The track revealed the same row of small nails, and plainly showed the imprints made by the hobnails.   Measurements were made of the spaces between the nails in the track, and those measurements correspond exactly with the same spaces between corresponding nails found in the shoe.   Additional, but indistinct, tracks were found, indicating that the same person had gone out to the fence and across to the north side of the road.   A horse had been tied on a hill north of the road.

It will be remembered that the tracks made by a woman led from a point about one rod east of the bars

in front of the barn. Commencing at this point tracks made by a horse were found leading along the north side of the road a short distance and then up a hill to a place in the brush about 180 feet from the road. There were indications showing that the horse had been tied to an oak sapling, and had stood there for an hour or two. There was a ring around the sapling showing that the rough bark had been rubbed as though by a rope tied around it. Black hair was found on the tree, and also on a tree immediately behind the prints made by the hind feet. Some rope fiber was picked up at the foot of the tree, to which the horse had evidently been tied. At about 8:30 on the morning of the 9th, Roy appeared at the scene of the fire, riding a black mare called Black Bess. He tied the mare to the fence on the south side of the road about 50 feet east of the bars at the Beamer barn. The mare was ridden back to the Farnam place that evening. On December 10th the tracks made on the hill on the north side of the road were traced to the Farnam barn. Black Bess was then taken out of the barn, and measurements were made of her hoofs. These measurements correspond exactly, not only with the tracks made by the mare when taken out of the barn at that time, but also with the tracks made by the horse that had gone up the hill. The horse tracks in the road between the Farnam place and the Beamer barn showed that the two trips had been made by the same animal, one set of tracks being slightly fresher than the other. The tracks made on one trip going west turned out of the road in toward the Morgan home, and then proceeded on west toward the Beamer barn. When the mare was taken out of the Farnam barn on the 10th, she was tied with a halter that had a rope, and Lester Farnam testified that a rope was attached

to every halter that they had. Droppings left by the horse when ascending or descending the hill contained wheat, and on the 10th every manger in the Farnam barn contained wheat hay.

Allen Brown testified that he stayed at the Gilliam house on the night of December 8th. The Gilliam ranch is located between the Farnam and Morgan homes, being about three miles west of the Farnam place and about two miles east of the Morgan residence. Brown went to bed about 10 o'clock on the night of the 8th, but was kept awake by a dislocated thumb until about 2 or 3 in the morning. This witness says that about one hour and a half after he went to bed he saw a horse and a rider pass along the road going west, and about 2 o'clock in the morning he heard a horse cross a bridge not far from the house. The defendant says he retired at 10:15 the night of the 8th, and it appears that he arose about 5 o'clock the next morning.

About noon on December 8th, the defendant wrote and addressed a letter to Edna Morgan, and at his request his mother put it in the mail-box, and then telephoned to Edna, telling her that she would receive a letter. The stage reached the Morgan home about 4 o'clock and Edna was seen to receive a letter from the driver. She read it on the way to the house, and then put it in her bosom. That morning Mabel and Alice Barton came to the Morgan home to visit with the Morgan girls, and before the arrival of the stage, it was understood that Edna was to go home that evening with the Barton girls and stay overnight with them, at their home about two miles west of the Morgan place; but, after receiving the letter, Edna decided not to go home with the Barton girls, because she thought that Roy would come down that evening.

After Roy had done the chores, and about supper-
time, he was called to the phone by Jimmie Pickett,
who asked the defendant to come over to the Jeffries
home and play cards that evening, but Roy answered,
saying that he could not because he was busy. After-
ward the defendant was called to the phone by Edna,
and they had some telephonic conversation.

If time and space permitted, many additional de-
tails could be recited which dovetail with, strengthen
and support the prominent features of the story of
Edna Morgan's disappearance; but no attempt will be
made to enlarge upon the narrative, except to note
that when at the scene of the fire on the morning of
the 9th, the defendant said, "I will be blamed for
this," and, according to the testimony of Mrs. E. E.
Wilson, a short time afterward, and on the same
morning, he said, "How much better marriage would
have been than this." There was ample evidence to
justify the jury to find that the defendant at some time
after 10:15 left his home on Black Bess, passing the
Gilliam house three miles distant, when Brown says
he saw a horse and rider going west, and that, pur-
suant to an engagement, he picked up Edna at her
home, and proceeded on toward the Beamer barn three
fourths of a mile away; that as they reached the bars
Edna got off the horse at the center of the road, and
went in toward the barn, while Roy rode the mare a
little farther west down the side of the road, and then
up the hill north of the road, and, after tying his horse,
joined Edna and went in the Beamer barn with her,
and subsequently produced an abortion upon her; that
to conceal the crime he set fire to the barn, made his
exit through the door at the west end of the shed, went
to the fence, crossed to the north side of the road, and
on up to the place where the mare was tied, and then

started for home, passing the Gilliam house at about the time when Brown heard a horse cross the bridge, and arriving home considerably before 5 o'clock on the morning of the 9th. Moreover, the shot heard by Mrs. Dewey and the three pieces of lead found by Harry Wilson furnished some evidence at least tending to show that the defendant did not stop with an abortion. While the evidence is circumstantial, still it is stronger both in quantity and quality than the record made in *State* v. *Williams,* 46 Or. 287 (80 Pac. 655), and the transcript of testimony presented here is in no respect less convincing, but in many particulars is more forceful than the case made by the prosecution in *State* v. *Barnes,* 47 Or. 592 (85 Pac. 998, 7 L. R. A. (N. S.) 181).

9. The defendant complains of a ruling which permitted an answer given by Mabel Barton to remain in the record. When a witness for the state, Mabel Barton, was asked by the district attorney:

"Now tell the jury what Edna told you about going home with you that evening."

The witness answered:

"She said she could not because she thought Roy was coming down."

The court, however, overruled a motion to strike, on the theory that it was competent for the state to prove that Edna Morgan had planned to meet the defendant, and the testimony was offered by the state for that purpose.

Even though it be assumed that the testimony moved against was incompetent, nevertheless the defendant is in no position to claim that he was materially prejudiced by it. R. M. Morgan was the first witness called by the state. On direct examination he testi-

fied about having seen Edna receive a letter from the stage-driver on the afternoon of the 8th, and upon cross-examination counsel for the defendant asked this question:

"Now then, you say Edna received a letter the day before from Roy Farnam. How do you know the letter was from Roy Farnam?"

The witness answered:

"Charley Hobbs said he got it out of the Farnam mail-box, and it was addressed to Edna. As far as my positively knowing that Roy Farnam wrote the letter that Charley Hobbs gave her, I don't know. All I know is that she got the letter. She told the girls it was from Roy; she could not go home with the Barton girls because Roy was coming that evening."

The answer was responsive to the question, and no objection was at any time made to any part of the answer. The testimony was elicited by the defendant himself, and it was a part of the record when Mabel Barton testified afterward. Moreover, defendant himself invoked the same rule when offering a letter that had been written by Edna Morgan. The answer of Mabel Barton was substantially the same, and not materially different from the testimony given by R. M. Morgan; even if the court had taken the answer of Mabel Barton from the jury, it is nevertheless fair to assume that the testimony of R. M. Morgan would have remained in the record, for the reason that it was elicited by the defendant himself, and was not objected to at any time during the trial; and therefore the defendant could not have been prejudiced, as now contended by him. It is true that the failure to object to the evidence of R. M. Morgan may not operate as a waiver of any right to object to like evidence on the part of Mabel Barton if such evidence was incompe-

tent; but the indisputable fact still stands out in bold
relief that so long as the testimony of R. M. Morgan
remained in the record, any failure to eliminate the
answer of Mabel Barton could not injure the defendant
to the extent claimed by him.

It was competent, however, for the prosecution to
show that the deceased intended to meet Roy Farnam
that night. The ruling of the court is not within the
ban of the hearsay doctrine, nor is it novel or startling.
Judicial precedents and text-writers of recognized
authority support the admission of declarations made
in cases analogous to the one in hand. In *State* v.
*Hayward,* 62 Minn. 474 (65 N. W. 63), Harry Hay-
ward was convicted of having procured one Claus
Blixt to murder Catherine Ging. She was shot about
7 o'clock on the evening of December 3d. A Mrs.
Hazelton, a witness for the state, was permitted to
testify that she was with Miss Ging in a dry-goods
store in Minneapolis about 4:35 P. M. on the day of
the murder; that the witness and Miss Ging left the
store together about 5:00 P. M. and as they were part-
ing Mrs. Hazelton asked Miss Ging to go home with
her to dinner, and the latter answered that she could
not because "she had a business engagement with Mr.
Hayward." The testimony was held to be competent.

In *Hunter* v. *State,* 40 N. J. Law, 495, Benjamin
Hunter was convicted of the murder of John M. Arm-
strong. At the trial the son of the deceased was per-
mitted to tell the jury that in the afternoon of the day
of the murder his "father said he intended to go with
Mr. Hunter, and he and Mr. Hunter were going to
Camden that night." About one hour after the con-
versation with the son the deceased wrote a letter to
his wife, saying:

"I will not be home much before 9 o'clock. I am going over to Camden again with Mr. Hunter, on business connected with the Davis matter."

The declarations of the deceased were held to be competent, the court saying:

"The present point of inquiry therefore is whether these declarations of Mr. Armstrong to his son, and the similar declarations contained in the note to his wife, can reasonably be said to be competent parts, or the natural incidents of the act of the deceased in going to Camden, which act was incontestably a part of the *res gestae*. After mature reflection and a careful examination of the authorities, my conclusion is that these communications of the deceased should be regarded as constituents of that transaction, for I think they were preparations for it, and thus were naturally connected with it. In the ordinary course of things it was the usual information that a man, about leaving his home, would communicate for the convenience of his family, the information of his friends, or the regulation of his business. At the time it was given, such declarations could, in the nature of things, mean harm to no one; he who uttered them was bent on no expedition of mischief or wrong, and the attitude of affairs at the time entirely explodes the idea that such utterances were intended to serve any purpose but that for which they were obviously designed. If it be said that such notice of an intention of leaving home could have been given without introducing in it the name of Mr. Hunter, the obvious answer to the suggestion I think is that a reference to his companion who is to accompany the person leaving is as natural a part of the transaction as is any other incident or quality of it. If it is legitimate to show by a man's own declarations that he left his home to be gone a week, or for a certain destination, which seems incontestable, why may it not be proved in the same way that a designated person was to bear him company? At the time the words were uttered or written, they imported no wrongdoing to anyone,

and the reference to the companion who was to go with him was nothing more, as matters then stood, than an indication of an additional circumstance of his going. If it was in the ordinary train of events for this man to leave word, or to state where he was going, it seems to me it was equally so for him to say with whom he was going.''

In *State* v. *Smith,* 49 Conn. 376, a conviction of murder in the first degree was affirmed, and the court held that it was competent for the wife of the deceased to testify that as he left his home he said ''that he was going to arrest 'Chip Smith,' meaning the prisoner.''

In *State* v. *Mortensen,* 26 Utah, 312 (73 Pac. 562, 633), the defendant was sentenced to death upon a conviction of murder. The wife of the deceased was permitted to testify that after supper on the night of the homicide, as her husband was leaving the house, he closed the door and said to her:

''I am going over to Peter's [defendant's] for a few minutes to collect some money. I will be back soon.''

The question of the admissibility of the quoted evidence was considered at length, and in the course of the discussion the court used this language:

''The principal objections to the admission of this testimony urged are that the defendant was not present when the statements were made, and that it is hearsay evidence, and not a part of the *res gestae.* These objections are not sound. The fact that the defendant was not present when the declarations testified to were made is wholly immaterial, and the statements are not merely hearsay evidence. They are declarations of the intention and purpose of the deceased to meet the defendant, and were admissible, as original evidence, under one of the exceptions to the rule of hearsay. Some courts admit such declarations

as a part of the *res gestae,* but we think they more properly come under the exceptions to the rule of hearsay evidence: Greenl. Ev., § 162a. The evidence of these declarations was not admitted for the purpose of showing that the deceased was actually at the house of the defendant, but to show what was in his mind— what his intentions were—at the time of utterance. Evidence of what a person's intentions were is relevant circumstantially to show that he afterward carried out his designs.''

In *United States* v. *Nardello,* 15 D. C. (4 Mackey) 503, it was decided that it was competent to show that when last seen alive, and as he left two companions, the deceased said ''he was going out to seek Nardello, to look for him.''

In *Thomas* v. *State,* 67 Ga. 460, Harp Thomas was convicted of murder on circumstantial evidence. On the night of the homicide, when in the act of leaving the house, and a short time before the murder, the deceased said:

''There are two persons down the alley; I think it is Harp and his sweetheart. I will go and see.''

The testimony was held to be admissible.

In *Mutual Life Ins. Co.* v. *Hillmon,* 145 U. S. 285 (36 L. Ed. 706, 12 Sup. Ct. Rep. 909), the beneficiary, claiming that her husband, John W. Hillmon, was dead, attempted to recover on a policy insuring his life. The company contended that John W. Hillmon was not dead, but that he was alive and in hiding. On the trial the plaintiff introduced evidence tending to show that about March 5, 1879, Hillmon left Wichita, in the state of Kansas, and traveled in South Kansas in search of a site for a cattle ranch, and that on the night of March 18th, while in camp at a place called Crooked Creek, Hillmon was killed by accident on the discharge of a gun. The company introduced evidence

tending to show that the body which was represented to be Hillmon's was not that of Hillmon, but was the body of Frederick Adolph Walters. About the first week of March, Walters wrote a letter to his sister, which read in part as follows:

"I now in my usual style drop you a few lines to let you know that I expect to leave Wichita on or about March 5th, with a certain Mr. Hillmon, a sheep trader, for Colorado or parts unknown to me. I expect to see the country now. News are of no interest to you, as you are not acquainted here. I will close with compliments to all inquiring friends. Love to all."

Under date of March 1st, at Wichita, Kansas, Walters wrote a letter to his fiancée, reading thus:

"Your kind and ever welcome letter was received yesterday afternoon about an hour before I left Emporia. I will stay here until the fore part of next week, and then will leave here to see a part of the country that I never expected to see when I left home, as I am going with a man by the name of Hillmon, who intends to start a sheep ranch, and as he promised me more wages than I could make at anything else I concluded to take it, for a while at least, until I strike something better. There is so many folks in this country that have got the Leadville fever, and if I could not have got the situation that I have now I would have went there myself; but as it is at present, I get to see the best portion of Kansas, Indian Territory, Colorado and Mexico. The route that we intend to take would cost a man to travel from $150 to $200, but it will not cost me a cent; besides, I get good wages. I will drop you a letter occasionally until I get settled down; then I want you to answer it."

The communications were held to be competent evidence of the intention of Walters at the time of writing them, the court saying:

"Man's state of mind or feeling can only be manifested to others by countenance, attitude or gesture,

or by sounds or words, spoken or written. The nature of the fact to be proved is the same, and evidence of its proper tokens is equally competent to prove it, whether expressed by aspect or conduct, by voice or pen. When the intention to be proved is important only as qualifying an act, its connection with that act must be shown, in order to warrant the admission of declarations of the intention. But whenever the intention is of itself a distant and material fact in a chain of circumstances, it may be proved by contemporaneous oral or written declarations of the party. The existence of a particular intention in a certain person at a certain time being a material fact to be proved, evidence that he expressed that intention at that time is as direct evidence of the fact as his own testimony that he then had that intention would be. After his death there can hardly be any other way of proving it; and while he is still alive, his own memory of his state of mind at a former time is no more likely to be clear and true than a bystander's recollection of what he then said, and is less trustworthy than letters written by him at the very time, and under circumstances precluding a suspicion of misrepresentation. The letters in question were competent, not as narratives of facts communicated to the writer by others, nor yet as proof that he actually went away from Wichita, but as evidence that, shortly before the time when other evidence tended to show that he went away, he had the intention of going, and of going with Hillmon, which made it more probable both that he did go, and that he went with Hillmon, than if there had been no proof of such intention.''

Some of the many additional illustrations of the rule may be found in *State* v. *Power,* 24 Wash. 34 (63 Pac. 1112, 63 L. R. A. 902); *State* v. *Dickinson,* 41 Wis. 299; *Mathews* v. *Great Northern Ry. Co.,* 81 Minn. 363 (84 N. W. 101, 83 Am. St. Rep. 383); *Eighmy* v. *People,* 79 N. Y. 546; *Commonwealth* v. *Trefethen,* 157 Mass. 180 (31 N. E. 961, 24 L. R. A. 235); *Common-*

*wealth* v. *Howard,* 205 Mass. 128 (91 N. E. 397); *Inness* v. *Boston etc. R. R.,* 168 Mass. 433 (47 N. E. 193); *The San Rafael,* 141 Fed. 270 (72 C. C. A. 388); *People* v. *Atwood* (Mich.), 154 N. W. 112; *State* v. *Hunter,* 131 Minn. 252 (154 N. W. 1083, L. R. A. 1916C, 566); *State* v. *Garrington,* 11 S. D. 178 (76 N. W. 326); *State* v. *Howard,* 32 Vt. 380; *Rogers* v. *Manhattan Life Ins. Co.,* 138 Cal. 285 (71 Pac. 348); *Denver & R. G. R. Co.* v. *Spencer,* 25 Colo. 9 (52 Pac. 211); *Weightnovel* v. *State,* 46 Fla. 1 (35 South. 856); *Walling* v. *Commonwealth* (Ky.), 38 S. W. 429; *People* v. *Conklin,* 175 N. Y. 333 (67 N. E. 624); *Railway Co.* v. *Herrick,* 49 Ohio St. 25 (29 N. E. 1052); *Carroll* v. *State,* 3 Humph. (22 Tenn.) 315; *Sharland* v. *Washington Life Ins. Co.,* 101 Fed. 206 (41 C. C. A. 307); *Cluverius* v. *Commonwealth,* 81 Va. 787; *Tilley* v. *Commonwealth,* 89 Va. 136 (15 S. E. 526); *Harris* v. *State,* 96 Ala. 24 (11 South. 255); *State* v. *Peffers,* 80 Iowa, 580 (46 N. W. 662); *State* v. *Jones,* 64 Iowa, 349 (17 N. W. 911, 20 N. W. 470); *State* v. *Winner,* 17 Kan. 298; *Territory* v. *Couk,* 2 Dak. 188 (47 N. W. 395); *Reg.* v. *Buckley,* 13 Cox's Cr. Cases, 293. See, also, 3 Wigmore, Ev., § 1725; 16 Cyc. 1184; 7 Ency. Ev. 622; *State* v. *Giudice,* 170 Iowa, 731 (153 N. W. 336, 342).

The concrete examples previously noted are not sporadic instances of the application of any strange and extraordinary doctrine, but, on the other hand, they are fairly illustrative of a rule of evidence which is firmly established by the overwhelming weight of judicial opinion. Jurists and text-writers, however, do not agree upon the theory of the doctrine. Declarations, like the one considered here, are, by many, and perhaps, by most, of the authorities, admitted as part of the *res gestae;* they are spoken of by some as verbal acts; and they are characterized by others

as original evidence admissible as an exception to the hearsay rule. An exemplification of the application of the rule and at the same time an illustration of the difference of opinion as to the basis of the rule may be found in *State* v. *Hayward,* 62 Minn. 474 (65 N. W. 63), where all the members of the court agreed that the declaration of the deceased was competent, the majority holding that:

"This statement forms a connected part of the evidence, and tends to characterize her subsequent acts and her departure on the fatal ride soon after she made the statement. This statement was not mere self-serving, hearsay evidence, but a verbal act, just as relevant as would be evidence that prior to her departure she put on her cloak or hat."

—and Mr. Chief Justice START saying that:

"This evidence clearly falls within the rule that, when the question is whether a person did a certain act, his declarations, oral or written, made prior to and about the time he is alleged to have done an act, to the effect that he intended to do it, are admissible as original evidence, if made under circumstances precluding any suspicion or misrepresentation."

While the writer inclines to the view expressed by Mr. Chief Justice START, 3 Wigmore, Ev., § 1726, *Jacobi* v. *State,* 133 Ala. 1 (32 South. 158), and *State* v. *Mortensen,* 26 Utah, 312 (73 Pac. 562, 633), yet the rule itself is now of more concern than the theory upon which it is founded.

If the doing of an act is a material question, then the existence of a design or plan to do that specific act is relevant to show that the act was probably done (1 Wigmore, Ev., § 102); and, considering the plan or design as a condition of the mind, a person's own statements of a present existing state of mind, when made in a natural manner and under circumstances

dispelling suspicion and containing no suggestion of sinister motives, only reflect the mental state, and therefore are competent to prove the condition of the mind, or, in other words, the plan or design.

10, 11. The declaration of Edna Morgan was made in a perfectly natural manner, and there is nowhere in the record any intimation that it was made otherwise. The whereabouts of Edna Morgan was a material issue. It was important to know what she did and where she went. The state contended that she met the defendant and accompanied him to the Beamer barn. Evidence of her declaration was competent to show what was in her mind, and that what she intended to do was probably done: *State* v. *Mortensen*, 26 Utah, 312 (73 Pac. 562, 633). The language used by her was only one way of stating that she intended to meet Roy Farnam, especially when it is remembered that on the preceding Sunday the defendant had accompanied Edna Morgan to her home after her visit with the Farnams. The jurors were not obliged to conclude that the letter alone and of itself prompted the statement made by her. The letter was not produced at the trial, and was probably destroyed. Testimony concerning the utterance made by Edna Morgan was neither offered nor admitted for the purpose of showing what Roy Farnam intended to do or did, but the transcript of the evidence discloses that the prosecution offered the testimony for the sole and express purpose of showing what Edna Morgan intended to do, and consequently the admission of the evidence did not violate Section 705, L. O. L. The statement made by the deceased did not recount anything that had previously occurred; it was not thᵉ statement of a fact external to the mind; it was not a narrative of a past event; and it does not belong to that class of utterances which are either expressly

permitted or impliedly rejected as evidence by Section 727, subdivision 4, L. O. L. The rule making the statement of Edna Morgan admissible does not contravene any section of the Code. If, as held by most courts, the *res gestae* doctrine is the basis of the rule admitting the declaration, then it is expressly sanctioned by the Code; or if the rule is founded on the idea that the utterance is a verbal act, a notion entertained by a few courts, then, strictly speaking, the evidence is not hearsay; or if, as the writer thinks, the true theory of the rule is that the statement of the deceased is original evidence of her intention, which the jury can consider as a circumstance indicating that she probably did what she intended to do, then on that theory no section of the Code is transgressed. The rule in question is analogous to the doctrine, approved by this court and recognized. generally, making exclamations of pain original evidence of a circumstance tending to show a particular bodily condition when the bodily condition of the person is a relevant fact: *State* v. *Mackey,* 12 Or. 154, 158 (6 Pac. 648); *Thomas* v. *Herrall,* 18 Or. 546, 549 (23 Pac. 497); *Vuilleumier* v. *Oregon W. P. & R. Co.,* 55 Or. 129, 132 (105 Pac. 706); 16 Cyc. 1164. If evidence is competent for one purpose, it cannot be rejected merely because it is not competent for another purpose. Being competent to show what Edna Morgan intended to do, the testimony of Mabel Barton was not rendered incompetent for all purposes merely because it was incompetent for the purpose of connecting Roy Farnam with the alleged crime, although it would have been proper to instruct the jury to limit the evidence to the sole purpose for which it was competent, and a failure to give a requested instruction to limit the application of the evidence to the single purpose for

which it is admissible would be error; but here the contention is that the testimony was not competent for any purpose: *State* v. *Finnigan,* 81 Or. 538 (160 Pac. 370). The conclusion that the testimony of Mabel Barton was competent has been reached with a full knowledge of the expressions to be found in *State* v. *Glass,* 5 Or. 73, 82; *State* v. *Anderson,* 10 Or. 448, 454; *State* v. *Ching Ling,* 16 Or. 419, 424 (18 Pac. 844).

12. I concur in what Mr. Justice BURNETT says about the refusal to permit an inspection of the feet of the mare and the rejection of the offer to prove the declarations of another person to show that such person had committed the crime charged against the defendant.   I concur in the reasoning and conclusion of Mr. Justice MCBRIDE relative to the sufficiency of the indictment to support the verdict of the jury.   There was sufficient evidence to show that Edna Morgan was killed, and that the defendant caused her death; and, in my opinion, no prejudicial error was committed during the trial.

MR. JUSTICE BURNETT delivered the following dissenting opinion.

The defendant was accused of the crime of murder in the second degree by an indictment reading thus:

"Roy A. Farnam is accused by the grand jury of the county of Douglas, State of Oregon, by this indictment, of the crime of murder, committed as follows: He, the said Roy A. Farnam, on the eighth day of December, A. D. 1914, in the said county of Douglas, State of Oregon, then and there being, did then and there wrongfully, unlawfully, feloniously, purposely and maliciously kill Edna Morgan in some manner and by some means unknown to the grand jury; and so he, the aforesaid Roy A. Farnam, did then and there in said county and state commit the crime of murder in the second degree by feloniously, purposely and

maliciously killing the aforesaid Edna Morgan, contrary to the statutes in such cases made and provided and against the peace and dignity of the State of Oregon.''

The errors assigned relate to proceedings during the trial on the plea of not guilty. The decedent, Edna Morgan, was a girl aged 15 years, and resided with her father, her junior sister, and two younger brothers at a point on the Pacific Highway about seven miles east of Glendale, in Douglas County. The defendant is a man about 23 years of age, living about five miles still farther east of Glendale, with his father, mother, sister and brother. So far as known, the last time the deceased girl was seen was by her father at their home late in the evening of December 8, 1914. About half-past 1 of the morning of the 9th, the barn of a man named Beamer, about a mile west of Morgan's residence, was found to be in flames. Later in the morning, when the building was almost entirely consumed, there was discovered in the fire the remains of a female. The body was so nearly destroyed as to be unrecognizable. It appears that for some months previously the defendant had kept company with Edna Morgan, escorting her to various places of entertainment, and she visited at the home of his parents, where his mother sometimes did sewing for her, as her own mother was dead. Some tracks were found near the burned barn, and evidence was given, tending to show that they matched with shoes worn by the defendant, and there were other tracks which corresponded in size to shoes worn by the deceased. A fetus, said by the medical witnesses who examined it to have arrived at about the fifth month of gestation, was found between the thighs of the corpse. Mabel Barton, a witness for the prosecution, aged 15 years, testified that

she and her sister went to the Morgan home about noon of December 8th to visit the Morgan girls, and in response to her invitation Edna agreed to go home with her and spend the night, but that during the afternoon the stage came along from the east, and the driver gave Edna a letter, which she read and put in her bosom. The prosecution then asked her this question:

"Now, tell the jury what Edna told you about going home with you that evening."

The witness answered:

"She said she couldn't because she thought Roy was coming down."

Defendant's counsel moved to strike out the latter part of the answer, referring to her statement that she thought Roy was coming down, but the court denied the motion, and allowed the entire response to go to the jury, over the exception of the defendant. The defense also offered to show oral statements made by a third party, tending to show that he himself had committed the murder of the woman whose body was found in the ruins of the barn. The court refused to receive that testimony, and the defendant assigns this as error. There was evidence tending to show that horse tracks were found leading from the direction of the defendant's residence to the burned barn and back again, and that they were identical with the tracks made by a mare ridden by the defendant over the same course and part way back on the day following the fire. One witness testified, in substance, that the track of the right front foot was nearly straight on the inside. At the trial in June, 1915, the defendant had the mare at the courthouse where the trial was held, and asked to have the jury inspect her foot, and afterward

offered the mare herself in evidence, but the court rejected his offer in both instances, and this is relied upon as error. At the conclusion of the argument the court stated to counsel, in substance, that the indictment charges murder in the second degree, and necessarily includes the crime of manslaughter, and that it was the view of the court that the latter offense should be submitted for the consideration of the jury, saying, however, that if counsel disagreed the court would hear them. Counsel for defendant then stated:

"We have no objection; I will nail my colors to the mast and sink or swim."

After some further parley with the district attorney the court said:

"I do not think there is any evidence as to the first section I read with reference to deliberation or heat of passion. I do not think there is any evidence to submit the case to the jury. I think I will submit murder in the second degree and manslaughter as by Section 1898 [referring to Lord's Oregon Laws]."

No exception was taken to this remark of the court. In the course of the instructions to the jury the judge charged as follows:

"If you find beyond a reasonable doubt that the defendant, while in the commission of an unlawful act, if he did commit an unlawful act, on the night that Beamer's barn burned in Douglas County, Oregon, involuntarily killed Edna Morgan, then it would be your duty to find the defendant guilty of manslaughter."

"I instruct you that if you find beyond a reasonable doubt that the defendant by any means committed an abortion upon the person of Edna Morgan, then I instruct you that such act, if such act took place, was an unlawful act, and if you find beyond a reasonable doubt that the defendant on the night that Beamer's barn burned in Douglas County, Oregon, committed an

abortion upon the person of Edna Morgan, and if you further find beyond a reasonable doubt that Edna Morgan was killed as a result of such abortion, if such abortion was committed, then it would be your duty to convict the defendant of manslaughter.''

At the close of the charge the defendant by his counsel excepted to all the statements of the court in charging the jury respecting manslaughter. The jury returned a verdict of guilty of manslaughter, and from the consequent judgment the defendant appeals.

As a judicial utterance it is not by the mark to assume the guilt of the accused as an established premise, nor to declare that it is conclusively proved. Mobs argue thus. It is the office of the prosecuting advocate to array his facts and employ pathos and invective to sway the jury and secure a verdict against the defendant. The function of a court of last resort is to ascertain from the record whether the trial court has observed the law in admitting or excluding testimony and in its charge to the jury. Under such ascertained conditions alone that body of 12 men has the exclusive prerogative of declaring whether the guilt of the defendant is established conclusively or otherwise. As pithily stated by Mr. Justice McBRIDE in *State* v. *Rader,* 62 Or. 37, 41 (124 Pac. 195):

''For the jury to find the fact, the court must see that they receive only legal evidence, and no good finding of fact can ever be predicated upon illegal evidence.''

Equally important in a jury trial are accurate statements to the jurors of the law applicable to the issue in hand: *Forrest* v. *Portland Ry., L. & P. Co.,* 64 Or. 240 (129 Pac. 1048); *Sullivan* v. *Wakefield,* 65 Or. 528 (133 Pac. 641). Let us consider whether these requirements have been fulfilled.

82 Or.—17

The record discloses that the case was tried upon purely circumstantial evidence. It became necessary, of course, to trace the defendant to the scene of the murder. It was evidently for this purpose that the state introduced the testimony of Mabel Barton, to the effect that Edna Morgan refused to go home with her because she thought he was coming down. Evidence tending to locate the decedent at the scene of the murder would indeed be relevant. Testimony, therefore, that she refused to go home with Miss Barton, but stayed at her father's house, was competent to locate Edna Morgan, but neither her thoughts nor the expression of them could be held to bind the defendant in tracing his movements. The prosecution relies upon the case of *Mutual Life Ins. Co.* v. *Hillmon,* 145 U. S. 285 (36 L. Ed. 706, 12 Sup. Ct. Rep. 909). That was an action by the beneficiary upon the policy insuring Hillmon. In response to evidence by which the plaintiff claimed to have proved the death of the assured, the defense sought to establish that the body said by the plaintiff to be that of the insured named in the policy was that of one Walters. For this purpose the company was permitted to read his letters to his sister and his fiancée, announcing his intention to go with Hillmon, the assured, into the vicinity where the corpse was found. All this was for the purpose of disclosing the movements of Walters, and not those of the insured. *Commonwealth* v. *Trefethen,* 157 Mass. 180 (31 N. E. 961, 24 L. R. A. 235), is a leading case on this subject, often cited to support the use in evidence of the declarations of third persons not parties to the litigation. There the defendant was on trial for the murder of Deltena Davis, a young woman with whom he had kept company. He offered to show by a clairvoyant named Hubert that a short time before

her body was found in the river Miss Davis had stated that she was advanced five months in pregnancy, and declared her intention to drown herself. The trial court refused his offer, but the Supreme Court held this to be erroneous, and that in order to show the cause of death the decedent's statement of her own purpose was competent to throw light upon her own subsequent conduct. The opinion by Mr. Chief Justice FIELD clearly limits such declarations to the state of mind or intent of the person making them, and declares them to be hearsay as to other persons or other affairs. He says:

"The most obvious distinction between speech and conduct is that speech is often not only an indication of 'what is in the mind' of the speaker, but a statement of a fact external to the mind, and as evidence of that it is clearly hearsay. * * Suppose that, at the interview between the deceased and the witness Hubert, if there was such an interview, the deceased had said that Trefethen was the father of her child; evidence that the deceased said this is clearly hearsay, and is not admissible to prove that he was the father; but suppose that it had been denied at the trial that the deceased knew that she was pregnant, testimony that she had said that she was pregnant would be some evidence that she knew it."

Likewise, in *State* v. *Hayward,* 62 Minn. 474 (65 N. W. 63), the *ante-mortem* statements of the deceased were used in evidence in tracing her own steps to the scene of the murder, but not as affecting the movements of the defendant. Also in *State* v. *Power,* 24 Wash. 34 (63 Pac. 1112, 63 L. R. A. 902), the syllabus reads thus:

"Where, on a trial for manslaughter by acts intended to produce a miscarriage, the deceased, on leaving her home for the place where the acts are alleged to have been performed, made statements as to

her intentions in going, such statements are admissible as verbal acts characterizing her intentions, but not as evidence that the defendant produced the abortion.''

The doctrine is crystallized in Section 705, L. O. L., thus:

''The rights of a party cannot be prejudiced by the declaration, act, or omission of another, except by virtue of a particular relation between them.''

By this excerpt from the Code the legislature has removed the question from the speculations of doctrinaires and the demands of overzealous prosecutors. It renders inapplicable the precedents cited in support of Mabel Barton's testimony. Under this provision we constantly hold in civil cases, where only money or other property is involved, that the declaration or act of one person shall not be taken to bind another, unless the authority to make the statement is first shown. Here, where the lifelong liberty of the accused is at stake, the prosecution calls upon us to admit the hearsay of Edna Morgan's utterance, not of any fact, but of what she thought, all without the least showing of any authorization from the defendant. The rule in criminal cases ought to be at least as strict as in civil contentions: Section 1535, L. O. L. Moreover, the reception by her of the note from the defendant is the only thing disclosed by the evidence which apparently could have influenced her to make the remark attributed to her. The only light on the contents of that letter is derived from the testimony of the defendant and his mother, to the effect that he had written to Edna that she could come to the Farnam home with his mother and sister the following Friday, as they returned from Glendale, which would save him from making a special trip for her. We cannot ignore this report of the contents of the writ-

ing, for there is no testimony to contradict it. There is nothing in it to induce her to expect the coming of the defendant, or to lead her to make the statement. On the contrary, the normal inference would be that he was not coming, and if for no other reason her statement to Miss Barton ought to be rejected, because it varies from what she would naturally say when she learned that he had planned for someone else to bring her to the home of his parents. There is nothing disclosed that gave her any right even to think he was coming. The better reason, however, is that, as against him, she had no authority to say she thought he was about to visit her. Her declarations or her thoughts on that subject are utterly incompetent as evidence as against the defendant. Respecting herself, the only material inquiry was concerning her whereabouts. Her reasons for remaining where she was are wholly immaterial and irrelevant, and cannot be admitted to the prejudice of the defendant. The error was essentially detrimental to him, because it related to the very material requisite of proving that he was at the scene of the crime when it was committed. Besides being a violation of the rule laid down in Section 705, L. O. L., the testimony of Mabel Barton on that point was the purest hearsay, and falls within the condemning reasoning of Mr. Chief Justice FIELD in the Trefethen Case. As applied to the defendant, her statement was of a fact external to her mind within the language of that opinion above quoted, and hence the purest hearsay. As affecting the *res gestae,* the best evidence of Edna Morgan's whereabouts was the testimony of her father and sister, to the effect that she was at home until bedtime of the night of her disappearance. Her refusal to go home with her friends was indicative of nothing more about her movements

than what was related by her father who saw her last. In the light of his testimony her staying at home during the preceding afternoon is negligible. The sole purpose of putting in evidence her unwarranted remark that she thought Roy was coming, and the only way the jury must have understood it, was to allow them to infer that he had written her he was coming, and upon this inference to presume that he did come and, finally, to infer on top of all this that they went together to Beamer's barn. This court has condemned such procedure in *State* v. *Hembree*, 54 Or. 463 (103 Pac. 1008). In that case the prosecution deemed it important to show some motive which urged the defendant to kill his wife, for whose murder he was being tried. For this purpose the state essayed to prove that he had sustained incestuous relations with his daughter and knowledge thereof on the part of the wife. All that was shown was a possible opportunity for illicit intercourse between the father and daughter while they were at a hotel in Tillamook. From this circumstance as stated by Mr. Chief Justice MOORE, who wrote the opinion, the jury was permitted to infer that the defendant had committed incest with his daughter; that from such deduction they were allowed to infer that the wife and mother had obtained knowledge of it, and that, based thereon, the jury was authorized to infer a motive for the commission of the alleged crime. A conviction was reversed for the error thus committed. On the point now under discussion that case is controlling in principle. The effort to prove the declarations of another person, tending to show that he had committed the crime in question, was properly rejected by the court under the authority of *State* v. *Fletcher*, 24 Or. 295 (33 Pac. 575). There the court held that such testimony was

hearsay, and on that ground rejected it. By the same token we should rule out the testimony of Mabel Barton about the declaration of the deceased, to the effect that she expected the defendant to visit her.

Again, the statute has prescribed the instances in which the declarations of a deceased person may be admitted in evidence. Section 727, subdivision 4, L. O. L., reads thus:

"In conformity with the preceding provisions evidence may be given on the trial, of the following facts: * * 4. The declaration or act, verbal or written, of a deceased person, in respect to the relationship, birth, marriage, or death of any person related by blood or marriage to such deceased person; the declaration or act of a deceased person, made or done against his interest in respect to his real property; and also the declaration or act of a dying person, made or done under a sense of impending death, respecting the cause of his death."

Only thus far has our Code opened the door for the admission of hearsay testimony concerning the declarations of deceased persons. The mention of these instances is the exclusion of all others. This is in accord with *State* v. *McGrath,* 35 Or. 109 (57 Pac. 321), teaching that the Code is complete on the subject of evidence. Treating of the construction of statutes, Section 715, L. O. L., is as follows:

"In the construction of a statute, * * the office of the judge is simply to ascertain and declare what is, in terms or in substance, contained therein, not to insert what has been omitted, or to omit what has been inserted; and where there are several provisions or particulars, such construction is, if possible, to be adopted as will give effect to all."

Section 716, L. O. L., provides thus:

"In the construction of a statute the intention of the legislature * * is to be pursued, if possible; and when

a general and particular provision are inconsistent, the latter is paramount to the former. So a particular intent shall control a general one that is inconsistent with it."

We have no right to read into the statute an additional exception to the general rule against hearsay testimony. The opinion of Mr. Justice RAMSEY in *State* v. *Goddard,* 69 Or. 73, 78 (133 Pac. 90, 138 Pac. 243, Ann. Cas. 1916A, 146), is a valuable writing on the doctrine of statutory construction as applied to this case and to this particular section of the Code. The general rule about the declarations of deceased persons is that they are admissible only as to such things concerning which the deceased, if alive, would be allowed to testify: *State* v. *Saunders,* 14 Or. 300, 305 (12 Pac. 441). Applying the doctrine to the present issue, we will suppose, for illustration, that the defendant had been indicted for assault with intent to kill Edna Morgan, and she had come to testify at the trial in such a case, as in this; it would be necessary to prove that she and the defendant met each other, but it is plain that she could not be allowed to declare on the witness-stand that she said to Mabel Barton, "I think Roy is coming down." If, when alive, she could not tell what expression of her thoughts she made to some other person—and no one pretends that she could—hearsay evidence of it cannot be rightfully given after she was dead. Her death adds no sanction to the declaration of her expectation. On this point Mr. Justice THORNTON wrote thus in *People* v. *Taylor,* 59 Cal. 640, 645:

"The law is well settled that the declarations of the deceased are admissible only to those things to which he would have been competent to testify if sworn as a witness in the cause. They must relate to facts only, and not to mere matters of opinion (1 Greenl.

Ev., § 159; 1 Whart. Am. Cr. L., § 678; *People* v. *Sanchez,* 24 Cal. 26; *Warren* v. *State,* 9 Tex. App. 629 [35 Am. Rep. 745]), or belief (*R.* v. *Sellers,* O. B. 1796, Car. C. L. 233; *McPherson* v. *State,* 22 Ga. 478; *Johnson* v. *State,* 17 Ala. 618; *McLean* v. *State,* 16 Ala. 674; 2 Barn. & C. 608; *Nelson* v. *State,* 7 Humph. [Tenn.] 542. * * The deceased could not have been allowed to testify as to his guesses, or as to whom he thought might have poisoned him, which was nothing more than an opinion or conjecture.''

Why should Edna Morgan dead be more competent as a witness than Edna Morgan living?

It matters not that the bill of exceptions fails to show that the defendant excepted to other testimony of the same kind that was elicited on cross-examination. He is not estopped to urge the objection when properly presented. He is not required to multiply exceptions on the same point indefinitely. One specification of error of the same kind is sufficient to raise the question for adjudication without padding the record with repetitions of the same objection.

It is true that the courts have measurably receded from the old doctrine that a defendant on trial for a felony cannot waive anything in his favor, but it is going to the other extreme to hold that because his counsel by possible inadvertence fails to object to certain incompetent testimony given by one witness, the defendant thereby waives the right to except to like statements of those testifying afterward. Waiver ought not to be pushed to such an extent, yet this is the only deduction to be drawn from the utterance of Mr. Justice HARRIS, to the effect that the defendant was not harmed by the statement of Miss Barton, because a similar declaration by Mr. Morgan was allowed to pass unchallenged. Neither is such evidence in the same category as expressions of pain or of the nature

of the malady affecting the declarant as approved in
*State* v. *Glass,* 5 Or. 73.   Under that precedent the de-
fendant was rightly permitted to read in evidence
Edna Morgan's letter, written about a month before
her alleged death, in which she spoke of her then "sick
week."   This was competent, as her declaration about
the state of her own health, to show that she could not
have been five months' advanced in pregnancy, as the
testimony tended to show was the case with the woman
whose remains were found in the burning barn.   The
admission of that letter in evidence does not, in any
manner, estop the defendant from opposing the at-
tempt of the prosecution to bind him by hearsay tes-
timony of Edna's unauthorized declaration of what she
thought he was going to do.

On the subject of admissibility of statements of a de-
ceased person, the victim of the homicide, the follow-
ing precedents are here noted: In *People* v. *Carkhuff,*
24 Cal. 640, the defendant was indicted for the murder
of his uncle, with whom he resided.   A witness for the
prosecution testified as follows:

"Deceased and I lunched together, about 2 o'clock
P. M.   My wife invited deceased to take supper with
us.   He declined, saying he must go home to attend to
cooking apples.   He said Sam, meaning defendant,
would be home that night; that he had gone to the park
to see a favorite officer and witness a review."

All the evidence tending to connect the defendant
with the crime was circumstantial.   The deceased was
last seen alive about 2 o'clock P. M. on Sunday, and his
corpse was found at his house between 7 and 8 o'clock
on Monday.   The court there says:

"The only object of the prosecution in offering in
evidence the declaration of the deceased that the de-
fendant would be at home on Sunday night was to en-
able the jury to presume, from the fact that the de-

ceased expected the defendant to return that night, that he did so return, and was there at the time of the commission of the murder. It is impossible to conceive· upon what theory that declaration was admissible. If the declaration had been made to the witness by any other person, it would not be contended that it was admissible in evidence, for evidently it would be obnoxious to the objection that it was hearsay testimony. The fact that the declaration was made by the deceased does not tend to remove the objection, for the declarations of the deceased are permitted to be proven in the single case when they are made *in extremis,* and have reference to the circumstances of the death, unless the declaration constitutes a part of the *res gestae,* or can be classed with declarations against interest, etc. * * It was not admissible as a part of the *res gestae,* for it did not constitute one of the circumstances surrounding the murder. The expectation of the deceased that the defendant would return, and that, too, unsupported by any evidence of the reasons for his expectations, did not even tend to prove any fact connected with the murder. The expectation may have been without any foundation; may have been merely a surmise arising from the defendant's usual habits. His expectation or declaration that the defendant would return at the time stated would possess no more legal value as evidence to prove the fact that he did return than would the expectation of his neighbor, Burns, that the defendant would return at the given time.''

*Cheek* v. *State,* 35 Ind. 492, was a murder case wherein a witness was allowed to report a conversation with the deceased, just prior to the homicide, wherein the latter said:

''Doc, I am glad you have come; there are two ruffians going up the road, and they have threatened to take my life; they have gone to my house, and I want you to go back with me.''

The court there held on this point that:

"A statement of the deceased person, made before the commission of the act, and not made in the presence or hearing of the defendant, is not competent evidence against him."

In *Weyrich* v. *People,* 89 Ill. 90, a wife was indicted for the murder of her husband by poisoning. It was held to be error to admit the declaration of the deceased that he suspected his wife to be unchaste, in the absence of any proof that such suspicion was ever communicated to her. In *People* v. *Irwin,* 77 Cal. 494 (20 Pac. 56), it was said that:

"The declarations of the deceased to third parties at various times before the homicide as to his fears of murder, and that he intended to leave the country because the defendant and others were conspiring to take his life, and that he had given them no cause, etc., are not admissible in evidence, and to admit them is highly prejudicial error."

In *People* v. *Gress,* 107 Cal. 461 (40 Pac. 752), the defendant was accused of murder. A witness detailed a conversation with the decedent had the evening before the homicide. The murdered man told him:

"I am in trouble. I have a family in Sonora, and a few months ago I took a young man in as partner with me, and here lately I have discovered that he is about to get away with my wife and child, and I want to get to Sonora as quick as possible. I want to save my boy, and that's my hurry for coming here."

Treating of this subject the court said, speaking by Mr. Justice VAN FLEET:

"This evidence was clearly hearsay, and was wholly inadmissible upon any possible theory of the case, or upon any principle or rule of evidence known to the law. It was no less hearsay because the declarations were those of the deceased, since proof of such declarations are only admissible when made *in extremis;* dying

declarations, having reference to the circumstances of the death, or when they constitute a part of the *res gestae.* \* \* In this case they were neither. The mortal blow had not been struck, nor were they in any manner connected with the rencounter which resulted in Assalena's death. Obviously the admission of this evidence was highly prejudicial to the defendant, since its inevitable tendency would be to greatly inflame and prejudice the minds of the jury against him."

In *Montag* v. *People,* 141 Ill. 75 (30 N. E. 337), the defendant was accused of the murder of his wife. It appeared that on the day of the homicide he called at the store where the shooting occurred between 12 and 1 o'clock, and had an interview with the deceased, lasting some two or three hours. He then left the store, but in a short time returned, and then the shooting occurred. A witness was allowed to give a conversation had with the deceased, which occurred 10 minutes after the defendant had left the store and 15 minutes before he returned. In answer to the question, "What did the deceased say to you after he had been out 10 minutes?" she replied:

"She told me that he warned her if he couldn't come and see her that night he would kill her. I asked her if she wasn't afraid, and she said no."

Quoting from the syllabus, the rule is there laid down thus:

"Declarations, to become a part of the *res gestae,* must be made at the time of the act done which they are supposed to characterize or illustrate, and must be calculated to unfold the nature and quality of the facts they are intended to explain, and to so harmonize with them as obviously to constitute one transaction. What occurs before or after an act has been done does not constitute a part of the *res gestae,* although the interval or separation may be very brief."

In *Kirby* v. *State,* 9 Yerg. (Tenn.) 383 (30 Am. Dec. 420), a statement of the deceased the day before he was killed that he was going on a certain trip, and that the defendant was to accompany him, is not admissible. In *State* v. *Punshon,* 124 Mo. 448 (27 S. W. 1111), a husband was prosecuted for the murder of his wife. He offered to show that their domestic relations were pleasant, also what she said as to the cause of her absence from him; her threats to kill herself, the reason therefor; that she was an expert in the use of firearms, and was in the habit of carrying a revolver. After discussion of the authorities cited, the court said:

"The statements of the wife which were offered to be proven were not part of the *res gestae* as exclamations of pain, nor were they with respect to her health, as in [authorities cited] and were properly excluded; and so were her statements to the effect that she intended to kill herself, for the same reasons. She was no party to the prosecution, and the state was not bound by anything she may have said. * * It will not be seriously contended that, if defendant's wife had been living, and he had been indicted for assault with intent to kill her, anything she might have said in regard to their amicable relations would have been admissible against the state, and, if not then admissible, the fact that she was dead at the time of trial did not make such statement permissible."

In *Parker* v. *Commonwealth* (Ky.), 51 S. W. 573, a murder case, the following language appeared:

"The court allowed John A. Murray, the father-in-law of the deceased, to testify to a conversation between them before the deceased started down the road, and he allowed the witness Buck York to state a similar conversation between him and the deceased at his house, in regard to his purpose in going down the road, This evidence was incompetent. The accused was not present, and evidence could not be made against him by statements not in his presence, and not in any way

connected with the shooting or throwing any light on it.''

*Holland* v. *State,* 162 Ala. 5 (50 South. 215), was a murder case. The court there said:

''The conversation between the deceased and Annie Liggan before the killing, and while the defendant was absent from the house, was not admissible. Neither should the trial court have permitted Mrs. Taylor to testify that deceased told her, about five minutes before the difficulty, and before the defendant had returned to the house, that 'Holland told him he was going after a gun and was coming back to kill him, and that he could not defend himself.' This was all hearsay evidence, and was not a part of the *res gestae.*''

In *McCray* v. *State,* 134 Ga. 416 (68 S. E. 62, 20 Ann. Cas. 101), it is said in the syllabus:

''Declarations made by the deceased in reference to his motive in seeking to find the accused, though made while on his way to the scene of the homicide in quest of the accused, were not admissible, over the objection of the accused, for the purpose of showing that the intention of the declarant in seeking the accused was peaceful and lawful.''

Another murder case was *State* v. *Shafer,* 22 Mont. 17 (55 Pac. 526). This excerpt is taken from the opinion:

''The court permitted witnesses to testify to declarations made by the deceased to them in the absence of the defendant, about 30 minutes before the homicide, that he (deceased) had had a difficulty with the defendant at Columbia Gardens that night; that he was not armed; that he was afraid of the defendant; that he wanted protection from the defendant; that he wanted defendant arrested, etc. It seems that this evidence was admitted for the purpose of showing deceased was not armed at the time he was shot by defendant. But we know of no theory upon which it was admissible.

It was not a part of the *res gestae.* It was clearly hearsay, and it was just as clearly error to admit it.''

In *Wall* v. *State* (Tex. Cr. App.), 62 S. W. 1062, the defendant was convicted of murder in the second degree. He was the manager of a sawmill, and had discharged the decedent from employment there. The following morning the latter returned, and in the ensuing altercation the defendant killed him. We quote from the opinion:

''In bill of exceptions No. 1, appellant complains that the court permitted Jack Hall to testify that, on the morning Johnson was killed, he came to his house and told him he was going down to the mill to pay defendant what he owed him; that he intended to leave Hardin County, and did not want to leave until he had paid Wall what he owed him. And in this connection the witness further testified that, from what Johnson told him on the morning he was killed, witness had concluded that he (Johnson) and defendant had made friends after the difficulty the day before. Appellant objects to this testimony for various reasons, mainly because it shows the animus, purpose and intent of deceased, which purpose and intent were not brought home to the knowledge of appellant. * * In *Johnson* v. *State,* 22 Tex. App. 206 (2 S. W. 609), this exact question was raised and discussed, and we there held, where testimony was introduced for the purpose of showing that deceased had no deadly purpose or intent when he went to the place of the homicide and that he did not go there for the purpose of executing his prior threats against defendant, that such testimony was error, because it was hearsay evidence, so far as defendant was concerned; and, secondly, because defendant could not be bound by the undiscovered and undisclosed motive of deceased, when the same were opposed and contradicted by all the facts and circumstances known to and judged by defendant from his own standpoint.''

*Wooley* v. *State* (Tex. Cr. App.), 64 S. W. 1055, was
a murder case. The trial court admitted the testi-
mony of witnesses about what the decedent said to
them in the absence of the defendant just before the
homicide, about his object in going into the defendant's
field and his purpose in going from thence to one
Griffith, who lived beyond the Wooley farm, to get
employment. The objection to the testimony was on
the ground that the defendant was not present at the
time, and knew nothing as to the purpose disclosed in
the conversation, indicating that the deceased was
there on a peaceful mission. The court said:

"It is true, the testimony is *res gestae* of deceased's
act; that is, his verbal act in connection with and ex-
plaining his conduct in being on the Wooley farm.
But *res gestae* is not always admissible, especially
where it makes proof of a fact that is bound to mate-
rially affect a defendant, and he has no notice or knowl-
edge of such fact. The authorities cited all bear out
appellant's contention to the effect that the testimony
was inadmissible, and the court committed a harmful
error in permitting its introduction."

To the same effect is *Adams* v. *State* (Tex. Cr.
App.), 64 S. W. 1055; *Young* v. *State,* 41 Tex. Cr. Rep.
442 (55 S. W. 331); *State* v. *Rees,* 40 Mont. 571 (107 Pac.
893); *Brumley* v. *State,* 21 Tex. App. 222 (17 S. W.
140, 57 Am. Rep. 612); *Johnson* v. *State,* 22 Tex. App.
206 (2 S. W. 609).

In *People* v. *Williams,* 3 Park. Cr. Rep. (N. Y.) 84,
the defendant and the decedent were husband and wife,
and lived apart. He was accused of murdering her
by administration of poison. For the purpose of
showing that they were together, and hence that he
had an opportunity to kill her, evidence offered of her
declaration, on leaving her residence, that she was
going to meet her husband, was immaterial, and not

o

part of the *res gestae*. The court there declared that the evidence was not offered to qualify an act connected with the issue, but to induce the jury to infer another act not otherwise shown to exist, that of his being in company with the deceased. In *Foster* v. *Shepherd,* 258 Ill. 164 (101 N. E. 411, Ann. Cas. 1914B, 572, 45 L. R. A. (N. S.) 167), it was held incompetent to receive the declarations of the decedent about where he was going to spend the night so as to account for his being where he was killed when mistaken for a burglar. In *Chicago etc. Ry. Co.* v. *Chancellor,* 165 Ill. 438 (46 N. E. 269), the action was brought against the company by an administrator, to recover damages for causing the death of his decedent. At the trial a witness was permitted to testify that she was at the house of the decedent between 7 and 8 o'clock in the morning in question, and that the latter told her she was going on the 9 o'clock train; that being the hour at which she was afterward killed. The question was material because the endeavor was thereby to show that she intended to become a passenger on that train. This materially affected the degree of care to be observed by the defendant, for if she was a passenger, the caution to be observed toward her was much greater than if she was not occupying that relation. The court held that her declarations about her purpose to take that train were inadmissible, although she went to the depot at that time and was there killed by the train. All these cases are illustrative of the attitude of the deceased toward the act in question, and are characteristic of his purpose in connection with the situation resulting in his death. The reasoning of these precedents is convincing that, in the absence of knowledge on the part of the defendant, the declarations of the decedent are entirely immaterial, are not part of the

*res gestae,* and cannot be admitted in evidence against the accused. In cases of circumstantial evidence, such things only serve to inflame the imagination, which always tinges that class of testimony. The declarations imputed to Edna Morgan, to the effect that she thought the defendant was coming, could not have been received in evidence if made by any other person at the same time and place. The fact that she is dead does not add to their admissibility or relevance.

13, 14. It has generally been held that the admission in evidence of material objects, or an inspection of the same, whether offered in evidence or not, is within the discretion of the court. We have before us, as an exhibit in the case, what purports to be a track of a man's shoe made in the soil near the barn. The earth was dug up with the track impressed thereon, was used in evidence, and is present here as an exhibit. It would not be far afield to characterize as capricious a discretion which would carry into the record a spadefull of barnyard filth and deny the jury an inspection of the feet of a horse upon whose track the prosecution relied as tending to connect the defendant with the crime. But, considering that the offer of the mare was made six months after the crime was committed, and there was no testimony tending to show that the foot was in substantially the same condition at both dates, we are not prepared to say that the court abused its prerogative in refusing the jury an inspection of the animal. On the other hand, if it had permitted an examination of her foot, no complaint whatever could have been made of such a ruling.

Regarding the correctness of the instructions on manslaughter, it is convenient as a preliminary to here set down the various provisions of the Criminal Code respecting the taking of human life:

"If any person shall purposely, and of deliberate and premeditated malice, or in the commission or attempt to commit any rape, arson, robbery, or burglary, kill another, such person shall be deemed guilty of murder in the first degree": Section 1893, L. O. L.

"If any person shall purposely and maliciously, but without deliberation and premeditation, or in the commission or attempt to commit any felony, other than rape, arson, robbery, or burglary, kill another, such person shall be deemed guilty of murder in the second degree": Section 1894, L. O. L.

"If any person shall, by an act imminently dangerous to others, and evincing a depraved mind, regardless of human life, although without any design to effect the death of any particular individual, kill another, such person shall be deemed guilty of murder in the second degree": Section 1895, L. O. L.

"If any person shall, by previous engagement or appointment, fight a duel within the jurisdiction of this state, and in so doing shall inflict a wound upon another, whereof the person so injured shall die, such person shall be deemed guilty of murder in the second degree": Section 1896, L. O. L.

"If any person shall, without malice express or implied, and without deliberation, upon a sudden heat of passion, caused by a provocation apparently sufficient to make the passion irresistible, voluntarily kill another, such person shall be deemed guilty of manslaughter": Section 1897, L. O. L.

"If any person shall, in the commission of an unlawful act, or a lawful act without due caution or circumspection, involuntarily kill another, such person shall be deemed guilty of manslaughter": Section 1898, L. O. L.

"If any person shall purposely and deliberately procure another to commit self-murder, or assist another in the commission thereof, such person shall be deemed guilty of manslaughter": Section 1899, L. O. L.

"If any person shall administer to any woman pregnant with a child any medicine, drug, or substance whatever, or shall use or employ any instrument or other means, with intent thereby to destroy such child,

unless the same shall be necessary to preserve the life of such mother, such person shall, in case the death of such child or mother be thereby produced, be deemed guilty of manslaughter'': Section 1900, L. O. L.

''If any physician, while in a state of intoxication, shall, without a design to effect death, administer any poison, drug, or medicine, or do any other act to another person which shall produce the death of such other, such physician shall be deemed guilty of manslaughter'': Section 1901, L. O. L.

''Every other killing of a human being by the act, procurement, or culpable negligence of another, when such killing is not murder in the first or second degree, or is not justifiable or excusable as provided in this chapter, shall be deemed manslaughter'': Section 1902, L. O. L.

On the postulate that it was allowable to instruct the jury on the subject of manslaughter only by the acquiescence of the defendant, his implied assent extended no further than to invite the court to correctly charge the jury on that topic. It is elementary that it is the duty of the court to declare the law and of the jury to report the fact by the verdict. The jury is not to be left to draw conclusions of law. That is the exclusive province of the court. The first instruction on manslaughter above quoted was founded upon Section 1898, L. O. L., but it left to the jury to determine the judicial question of whether the act, if any was shown, in the commission of which the defendant killed Edna Morgan, if at all, was an unlawful act. The second instruction was intended to cover the kind of manslaughter described in Section 1900. It is faulty in that it declares in substance that every abortion resulting in the death of the mother is a crime. Abortion means the premature or unnatural expulsion of the fetus from the uterus prior to the completion of the period of gestation. The Caesarian operation to

which resort is sometimes had for the purpose of saving the life of the mother is itself an abortion. It does not necessarily cause the death of the mother or the child, though it generally is the death of one or both. The term does not imply crime as was held in *Belt* v. *Spaulding*, 17 Or. 130 (20 Pac. 827). The instruction leaves out of consideration, not only the intent to destroy the child, but also the lack of necessity to preserve the life of the mother, both material ingredients of the crime condemned by Section 1900. If the court entered upon the task of explaining manslaughter in any of the various forms in the different sections of the statute already quoted, it should have correctly defined the offense. Its failure to do so in the instances mentioned renders the instructions amenable to the exception taken by the defendant at the close of the charge, although it might be said he consented that the court should charge the jury on manslaughter. The vice of the instruction lies in the assumption that bringing about an abortion is necessarily a crime, whereas it is only one element of an offense, the other ingredients of which were not mentioned or explained to the jury, but were taken for granted. The plea of not guilty and the presumption of innocence combat the indictment and all the testimony for the prosecution, so that, even if nothing else were shown, the court had no right to assume the other facts besides the mere abortion necessary to constitute an unlawful act or offense under Section 1900.

Still further: The following sections of Lord's Oregon Laws are here set forth:

"When it appears that the defendant has committed a crime, and there is reasonable ground of doubt in which of two or more degrees he is guilty, he can be convicted of the lowest of those degrees only": Section 1528, L. O. L.

"Upon an indictment for a crime consisting of different degrees, the jury may find the defendant not guilty of the degree charged in the indictment, and guilty of any degree inferior thereto, or of an attempt to commit the crime or any such inferior degree thereof": Section 1551, L. O. L.

"In all cases, the defendant may be found guilty of any crime, the commission of which is necessarily included in that with which he is charged in the indictment, or of an attempt to commit such crime": Section 1552, L. O. L.

There is no crime in this state unless the same is defined by statute. In other words, there are no common-law crimes under our system of jurisprudence. Sanction must be found in some statute for every criminal accusation: *State v. Vowels,* 4 Or. 324; *State v. Gaunt,* 13 Or. 115 (9 Pac. 55); *State v. Nease,* 46 Or. 433 (80 Pac. 897); *State v. Ayers,* 49 Or. 61 (88 Pac. 653, 124 Am. St. Rep. 1036, 10 L. R. A. (N. S.) 992); *State v. Smith,* 55 Or. 408 (106 Pac. 797); *State v. Stephanus,* 53 Or. 135 (99 Pac. 428, 17 Ann. Cas. 1146); *State v. Smith,* 56 Or. 21 (107 Pac. 980). Murder is the only crime classified by degrees, and so we have murder in the first and second degrees as defined by statute. Manslaughter is not a degree of murder. All the six different kinds of manslaughter are unlike either murder in the first degree or murder in the second degree in essential particulars. The question of degrees, therefore, cannot be considered in this case under Section 1528, because there is no accusation for anything else than the lowest degree of murder as affected by Sections 1528 and 1551.

Under the present indictment, in order for the jury to be allowed to convict of manslaughter, we must hold that it is necessarily included in the terms of that accusation. We note that it says the defendant "wrong-

fully, unlawfully, feloniously, purposely and malici-
ously killed Edna Morgan in some manner and by some
means unknown to the grand jury." We cannot say
as a matter of law that any of the six different kinds
of manslaughter is necessarily included within that
statement. The indictment in hand does not measure
up to the terms of Section 1440, L. O. L., which re-
quires that:

"The indictment must be direct and certain, as it
regards, * * the crime charged; and, the particular
circumstances of the crime charged when they are
necessary to constitute a complete crime."

"The particular circumstances" mentioned in the
sections defining the several kinds of murder and man-
slaughter serve to differentiate one sort from another,
and, being thus made necessary to constitute a com-
plete crime, must directly and certainly appear in the
indictment if a conviction is to be had on any of them.
The principle at stake is whether a defendant can be
committed of an offense of which the indictment gives
him no information. True enough, the legislative
branch of the government may simplify forms, but
sufficient must be left in the accusing document to pre-
serve and satisfy the constitutional rights of the ac-
cused: *State* v. *Learned,* 47 Me. 426; *State* v. *Mace,*
76 Me. 64. It is true that the forms in the appendix
to our Code allow the allegation that the means em-
ployed to commit the crime are unknown to the grand
jury; but in so far as that provision deprives the de-
fendant of the right to know the nature and cause of
the accusation against him it is unconstitutional. If
the grand jury has not enough evidence to justify an
indictment, so much the worse is it for the prosecution.
No one can tell from the accusing document whether
the defendant was to be tried for either of the two

classes of murder in the second degree described in
Section 1894, or for the killing of a person by an act
imminently dangerous to others, evincing a depraved
mind, regardless of human life, as defined by Section
1895, or whether it was a homicide, committed while
fighting a duel as condemned in Section 1896. Besides,
it is impossible to say as a matter of law that either of
the six sorts of manslaughter already mentioned is in-
cluded in either of the four kinds of murder in the
second degree. It is elementary that enough must be
found in the indictment upon which to base a judg-
ment of conviction. If it is proposed to convict of
manslaughter under Section 1897, there should be suf-
ficient in the written accusation to show that the de-
fendant, without malice and without deliberation, but
upon a sudden heat of passion caused by a provoca-
tion apparently sufficient to make the passion irresis-
tible, voluntarily killed the deceased. Or, if the de-
fendant was to blame for assisting the deceased to
suicide, it should have been so stated, and likewise,
as to the administering of any drug or employing
any means upon a pregnant woman resulting in her
death. This should appear in the indictment if the
state would secure a conviction for that form of man-
slaughter. In short, the legislative branch of the gov-
ernment has seen fit to define six different classes of
acts constituting manslaughter, and at least four con-
stituting murder in the second degree, distinguishing
them all as separate statutory offenses. The prose-
cution cannot be wiser than the lawmakers, obliterate
all these points of difference, cast a dragnet in the
form of a general indictment for murder, and be al-
lowed to prove any one of the half dozen kinds of
manslaughter or the four kinds of murder in the sec-
ond degree. For arbitrariness such procedure excels

the well-known detective stratagem of apprehending the victim of some trivial charge and holding him until a graver case can be made out against him. It is to make conviction depend, not upon indictment which gives notice to the accused of what he is called upon to oppose by his defense, but upon what the prosecution may be able to fish out of testimony given in the star chamber of the grand jury. The true knowledge of "the nature and cause of the accusation" dawns not upon him until he has heard the instructions to the jury. The state does not come into the open and give its accused citizen notice of the charge against him; but, on the contrary, conceals its real purpose in generalities and sets a snare for his feet. In making the charge the grand jury must classify it according to the distinctions laid down by the statute. To hold otherwise is to abuse the constitutional right of the defendant "to demand the nature and cause of the accusation against him, and to have a copy thereof": Article I, Section 11, of the Constitution. To have a copy of the accusation means that the indictment upon which he is tried must state the facts covering the specific crime for which the state would secure a conviction. Within the terms of the organic act nothing less will conserve the rights of the accused under its protective feature or meet his constitutional demand. The prosecution is entitled to carve as great a crime out of any transaction as it can, but it is restricted under our Constitution and laws to that accusation to the exclusion of other different crimes except so far as one is necessarily included in the other. No other conclusion is logical, unless we entirely disregard Section 1442, L. O. L., saying, "The indictment must charge but one crime, and in one form only." It would mean that in crim-

inal pleadings we must discard all legislative dis-
tinctions between the various kinds of homicide and
sweep into the scrapheap all rules about making an
accusation conform to the statute. The form for mur-
der in the first degree appearing in the appendix to
the Criminal Code will answer for the "one form
only," and no prosecutor need concern himself about
setting out in his indictment any of the elements con-
tained in the legislative definitions of other varieties
of homicide.

Much reliance is placed by the prosecution upon
*State* v. *Magers,* 35 Or. 520 (57 Pac. 197), where the
matter is thus summed up:

"The rule to be extracted from these decisions
seems to be that if the manner of the killing is un-
known, and circumstantial evidence only is relied upon
to connect the defendant with the commission of the
crime, it is the duty of the court, when so requested,
to instruct the jury upon the law applicable to murder
in the first degree, murder in the second degree, and
manslaughter, and where it appears that the defend-
ant has committed a crime, and there is reasonable
ground of doubt in which of two or more degrees he
is guilty, he can be convicted of the lowest of these de-
grees only."

There are several reasons why that case should not
control the present contention. There, the defendant
sought to escape the death penalty by shunting the
jury on to the subject of manslaughter. Here, the
defendant is arguing against being called to meet a
charge of which the indictment gave him no notice.
That decision makes a manslaughter instruction de-
pend upon the request of the defendant, but here the
defendant did not ask for it. His attitude is por-
trayed in the words of his counsel, "I will nail my
colors to the mast and sink or swim." His saying

at the same time, ''We have no objection,'' cannot
be construed into a request for such a direction to the
jury.   Again, the opinion takes no account of distinc-
tions between different crimes and of the necessity
of making an indictment conform to the statute, nor
does it give any consideration to the constitutional
right of the defendant already mentioned.   It makes
the broad statement that a manslaughter instruction
should be given where and whenever circumstantial
evidence is present in the case, but when we ask what
one of the six different kinds of manslaughter must
be described to the jury, we look in vain to the Magers'
decision for an answer.   Trial judges are left to con-
jecture on this subject.   That precedent ignores the
indictment as a foundation of conviction and permits
the state to rely solely upon whatever theory may be
developed in the testimony, irrespective of the form
of the grand jury's accusation.   In the instant case
it would have been quite as proper to allow a ver-
dict of arson, because there was evidence about the
burning of a barn.   Finally, the decision proceeded
on a misapprehension of the statute, viz., that man-
slaughter is a degree of murder.   It is, indeed, a
species of homicide, but the Code has made it a dis-
tinct crime.   It is not a degree of murder, nor a de-
gree of any offense.   Our legislation, without which
there is no crime in this state, has made it *sui generis*
in its several forms, and it should be so treated.

The court undertook to instruct the jury about the
species of manslaughter defined in Section 1898,
L. O. L., aimed against one who involuntarily kills
another in the commission of an unlawful act or a
lawful act without due caution or circumspection.
The justification for this course must be found, if at
all, in Section 1552, allowing the conviction of a crime,

the commission of which is necessarily included in the one charged in the indictment. The accusation is that the defendant did the act "purposely and maliciously." An act done "involuntarily" is not and cannot be included in the category of those done "purposely." The two words are antonyms. They are radically distinct and opposite in meaning. It is an abuse of the statute to say that involuntary homicide is necessarily, or in other words, as a matter of law, included in that done with purpose and malice. On this subject Mr. Justice EAKIN in *State* v. *Whitney*, 54 Or. 438 (102 Pac. 288), held the prosecution to a strict compliance with the statute in drawing an indictment. We read from the syllabus:

"An indictment, alleging that accused feloniously and voluntarily administered a suppository containing poison to another, from the effects of which she died, was insufficient, under Section 1897, L. O. L., making it manslaughter to voluntarily kill another upon a sudden heat of passion, but without malice and deliberation, in that it did not allege facts constituting voluntary manslaughter."

On the contrary he decided, further, that:

"An indictment alleging that accused feloniously and voluntarily administered poison to another, from the effects of which she died, did not charge involuntary manslaughter, under Section 1898, L. O. L., making it involuntary manslaughter to involuntarily kill another, while engaged in the commission of an unlawful act, or a lawful act without due caution, in that it did not allege facts showing any unlawful act, or a lawful act negligently committed."

The lesson to be drawn from that decision is that where the statute makes distinctions in the ingredients of a crime, the pleader must observe them.

To approve the instruction of the court about abortion, we would be driven logically to the absurdity of holding that when the accusation says the defendant "wrongfully, unlawfully, feloniously, purposely, and maliciously killed Edna Morgan," it perforce means that, she being then pregnant with a child, the defendant administered to her some drug or medicine, or used or employed upon her some instrument or other means with intent to destroy the child, the same being unnecessary to preserve the life of the mother, by reason of all which her death was produced. Such a conclusion does violence to the constitutional rights of the accused, because it does not inform him of the nature of the real charge against him, in that it leaves out every ingredient of the manslaughter described in Section 1900 except the death of the mother. Neither in the indictment nor in the charge of the court on that point is there a syllable about the administration of any drug or medicine, the employment of any instrument, or an intent to destroy the child, or lack of necessity to preserve the life of the mother. It would be a travesty on all rules of criminal pleading to say that an indictment, couched in the language of the court about abortion, would be a good one under Section 1900, yet that would be the effect of an approval of that instruction. The defendant was entitled to accept the issue as the state tendered it, and if he chose the pure alternative of guilty of murder in the second degree or not guilty, he had a right to do so and ignore any other charge. Under this indictment, drawn as it is without reference to the particular circumstances of the case showing how the homicide was accomplished, the pleading was not sufficient to support any evidence or conviction of manslaughter. It was error to enter

upon that field of inquiry. It exposed the defendant to danger of conviction from a course of which he had no notice, and invited the jury into the realm of fancy and speculation upon visionary theories with no testimony to support them.

*Rayburn* v. *State,* 69 Ark. 177 (63 S. W. 356), was a case where the defendant was charged with murder in that:

He "did unlawfully, willfully, feloniously, and of his malice aforethought, and after premeditation and deliberation, kill and murder one A. T. Carpenter."

Under this indictment the trial court charged the jury:

"If you find from the evidence beyond a reasonable doubt that defendant in the perpetration of, or in the attempt to perpetrate, the robbery of A. T. Carpenter, shot and killed Carpenter, then defendant is guilty of murder in the first degree, and you will so find."

The case was at first affirmed on appeal, but on rehearing it was reversed on this point. The Arkansas statute is substantially like our own. The case is so apropos in treating of statutory crimes that the following excerpt from the opinion is here inserted:

"According to these statutes two classes of murder constitute murder in the first degree, to wit: (1) All murder committed by any kind of willful, deliberate, malicious and premeditated killing; and (2) all murder which shall be committed in the perpetration of, or in the attempt to perpetrate, arson, rape, robbery, burglary or larceny. In *Cannon* v. *State,* 60 Ark. 564 [31 S. W. 150, 32 S. W. 128], this court held that it is essential to the validity of an indictment for the first class of murder in the first degree to use the words 'willful,' 'deliberate,' 'malicious,' 'premeditated,' or equivalent words, in charging the offense. The reason for the ruling is, these words are descriptive of the elements necessary to constitute that class

of murder. For the same reason it is necessary to allege that the killing was done in the perpetration of, or in the attempt to perpetrate, one of the felonies named in the statutes quoted, in order to charge the second class of murder in the first degree. These two classes of murder in the first degree are separate and distinct. In the former a precedent intent to kill is necessary to constitute the offense, while in the latter it is not. While the former may be committed in the perpetration of or attempt to perpetrate, the felonies named, an indictment for the same will not always include the latter; and when it does, it is only because the essentials necessary to constitute the former exist. The perpetration of, or attempt to perpetrate, a felony necessary to constitute the second class is not equivalent to the premeditation, deliberation and intent necessary to constitute the first, except in effect. They raise the killing to the grade of that in the first class, but the allegations necessary to charge murder in the first degree in the first class are not equivalent to those necessary to charge the offense in the second. Hence an indictment which charges only the offense in the first class will not be sufficient to accuse the defendant of murder committed in the perpetration of, or in the attempt to perpetrate, one of the felonies named in the statute, unless it is committed with the intent to kill, and after premeditation and deliberation. In support of this conclusion we cite *Cannon* v. *State,* 60 Ark. 564 [31 S. W. 150, 32 S. W. 128], and the cases and authorities cited in the same. A defendant cannot be lawfully convicted of a crime with which he is not charged in the indictment against him. Some courts have held that he can be convicted of murder committed in the perpetration of, or in the attempt to perpetrate, the felonies named in the statute, under a common-law indictment for murder. But they do so because they hold that the law dividing murder into two degrees introduced no change in the form of the indictment, created no new offense, and only reduced the punishment for one of the degrees. We disapproved of this view in *Cannon* v. *State,* 60 Ark. 564 [31 S. W. 150,

32 S. W. 128], and held that it did make a change in the form of the indictment. It follows the instruction should not have been given.''

*Woods* v. *Commonwealth* (Ky.), 7 S. W. 391, was a murder case. The statute there, as in this state, defined a peculiar kind of homicide as manslaughter when perpetrated under certain circumstances. The court there held that:

''The statutory crime, as defined in Gen. Stats. Ky., c. 29, art. IV, § 2, as follows: 'Any person who shall stab another, not designing thereby to produce his death, and which is not done in self-defense, or in an attempt to preserve the peace, or in the lawful arrest or attempt to arrest a person charged with a felony, or in doing any other legal act, so that the person stabbed shall die thereof within six months next thereafter,' etc.—is not a degree of the offense charged in an indictment for murder; and an instruction as to the crime defined by this statute cannot be given in such a case.''

To the same effect is *Conner* v. *Commonwealth,* 76 Ky. (13 Bush) 714. In *Norris* v. *State,* 33 Miss. 373, it was held that under a general indictment for larceny of property the state cannot show that the theft was committed in another state, and brought into the domestic forum, so as to punish the defendant under a special statute making that larceny.

In *Huntsman* v. *State,* 12 Tex. App. 619, Mr. Justice Hurt considers exhaustively the matter of a lesser crime being included in a charge of one of greater consequence. Among other things, he says:

''Can the legislature remove any of these incidents? If so, which, and how many? If it can authorize omission of one, why not two, three, four or all of them? If it can provide for the omission of a single necessary ingredient in the description of the offense charged, it can authorize the omission of all words

82 Or.—19

descriptive of the act or omission, which, by law, is declared to be an offense. Thus it might provide for a trial of a citizen upon a written statement of a grand jury, accusing him of having violated the law, and authorize the prosecution to prove, on the trial, any act or omission violative of any provision of the written law. But it was for the purpose of preventing such unjust and tyrannical legislation and its consequences that the requirement of 'an indictment of a grand jury' was inserted in the Constitution. Were it otherwise, the grand jury might indict for theft upon a state of case sufficient, as presented to them, to warrant the charge, and on trial the defendant show his innocence of such offense, yet the prosecution could abandon that accusation and go on trying to establish embezzlement, swindling, receiving stolen goods knowing them to be stolen, obtaining property upon false pretenses, and, if in relation to live animals, driving them beyond their accustomed range; taking the chances of making a *prima facie* case of either or all of them, and so procure a conviction for an offense which the grand jury never heard of during their investigation, and for which they had no thought of indicting the accused. Thus the indictment presented would be made the mere stalk or stub on which the prosecution might seem least liable to be met, or, of which there might be the greatest probability of the defendant's having no information, so as to insure his conviction before he could prepare to answer. Such a construction would make the right not to be 'held to answer for any criminal offense except upon indictment of a grand jury' a deception, a fraud, a falsehood, to intrap innocent persons who confide in the truth of the law and its solemn proceedings, and to wrongfully convict them without any indictment of a grand jury, charging them with the crime for which they are held to answer. There must be such an indictment, so accusing the defendant of the very crime of which he is convicted, to sustain the judgment, and the want of it will not be supplied by one charging another offense

by allegations which do not include that for which the party is convicted.''

He sums up the matter thus:

''Finally: To allow the indictment for a greater to sustain a conviction for the lesser offense, it must contain the statement of every inculpatory fact and circumstance material to the description of the latter, and the two must be alike as to all the essential constituent elements of the lesser offense, so that the allegation will include it without contradicting the material averments of the greater. Whenever an indisputable constituent fact or circumstance of the lesser is not included in the greater, the latter cannot be made to include the former, no matter how many other facts and circumstances may be common to both.''

In *People* v. *Olmstead*, 30 Mich. 431, the indictment was for manslaughter in killing one Mary Bowers, whom it is averred he did ''feloniously, willfully, and wickedly kill and slay, contrary to the statute in such case made and provided,'' etc. The information did not name the offense, nor the manner, nor the means of its commission. The statute for manslaughter by producing abortion was substantially like our own. The court admitted to the jury considerable testimony designed to prove the offense thus described. The discussion of this point is contained in the following extract from the opinion:

''Respondent claims that the constitutional right 'to be informed of the nature of the accusation' involves some information concerning the case he is called on to meet, which is not given by such a general charge as is here made. And courts are certainly bound to see to it that no such right is destroyed or evaded, while they are equally bound to carry out all legislative provisions tending to simplify practice, so far as they do not destroy rights. The discussions on this subject sometimes lose sight of the principle

that the rules requiring information to be given of the nature of the accusation are made on the theory that an innocent man may be indicted, as well as a guilty one, and that an innocent man will not be able to prepare for trial without knowing what he is to meet on trial. And the law not only presumes innocence, but it would be gross injustice unless it framed rules to protect the innocent.

"The evils to be removed by the various acts concerning indictments consisted in redundant verbiage, and in minute charges, which were not required to be proven as alleged. It was mainly, no doubt, to remove the necessity of averring what need not be proved as alleged, and therefore gave no information to the prisoner, that the forms were simplified. And these difficulties were chiefly confined to common-law offenses. Statutory offenses were always required to be set out with all the statutory elements: *Koster* v. *People,* 8 Mich. 431. The statute designed to simplify indictments for statutory crimes, which is in force in this state, and is a part of the same act before quoted, reaches that result by declaring that an indictment, describing an offense in the words of the statute creating it, shall be maintained after verdict: C. L., § 7928. But both of these sections must be read in the light of the rest of the same statute, which plainly confines the omission of descriptive averments to cases where it will do no prejudice. And so it was held in *Enders* v. *People,* 20 Mich. 233, that nothing could be omitted by virtue of this statute, which was essential to the description of an offense.

"Manslaughter at common law very generally consisted of acts of violence, of such a nature that indictments for murder and manslaughter were interchangeable, by the omission or retention of the allegation of malice, and of the technical names of the offenses. In a vast majority of cases a very simple allegation would be enough for the protection of the prisoner. But where the offense of manslaughter was involuntary homicide, and involved no assault, but arose out of some negligence or fault from which

death was a consequential result, and sometimes not a speedy one, the ordinary forms were deficient, and the indictment had to be framed upon the peculiar facts, and could convey no adequate information without this: See 2 Bishop, Cr. Proc., § 538.

''The offense for which the respondent in this case was put on trial originated in the statute defining it, and could not have come within any of the descriptions of manslaughter at common law. An innocent person, charged under the information, could form no idea whatever from it of the case likely to be set up against him. He might, perhaps, be fairly assumed bound to prepare himself to meet a charge of manslaughter by direct violence or assault. By which one was meant, out of the multitudinous forms of indirect and consequential homicide that might occur after a delay of any time not exceeding a year, from an original wrong or neglect, and of which he might or might not have been informed, he could not readily conjecture. Nothing could inform him of this statutory charge, except allegations conforming to the statute. These we think, he was entitled to have spread out upon the accusation. Without them he was liable to be surprised at the trial, and could not be expected to prepare for it. We are not prepared to hold this information bad upon its face, for we are disposed to think, and it was practically admitted on the argument, that it may apply to the ordinary homicide by assault. It was not, therefore, until the evidence came in that it was made certain the case was different. The question of sufficiency does not arise directly upon the record, but on the bill of exceptions, and the error was in permitting a conviction on it.''

In *People* v. *Arnett,* 126 Cal. 680 (59 Pac. 204), it was held that under an indictment charging assault to commit murder, but which does not charge that the defendant made the assault with a deadly weapon, the conviction of the lesser offense cannot be sustained. In *Mapula* v. *Territory,* 9 Ariz. 199 (80 Pac. 389), it was decided that a conviction of aggravated assault may be

had under a murder indictment only after the facts constituting such assault are alleged in the indictment. *Goldin* v. *State,* 104 Ga. 549 (30 S. E. 749), laid down the principle that a verdict, finding a defendant guilty of assault and battery under an indictment charging assault with intent to commit rape, under which no battery is charged, cannot stand. Again, in *Watson* v. *State,* 116 Ga. 607 (43 S. E. 32, 21 L. R. A. (N. S.) 1), the court announced the doctrine that the crime charged in the indictment must necessarily include all the elements of the lesser crime, or the indictment must itself set them out by appropriate averments. *State* v. *Desmond,* 109 Iowa, 72 (80 N. W. 214), declares that to justify a conviction of assault and battery under an indictment charging assault with intent to commit rape, it must be averred in the indictment that the attempt was accompanied with actual violence. It is taught in *People* v. *Adams,* 52 Mich. 24 (17 N. W. 226), that in a trial for murder not charged to have been committed with assault, a conviction of assault is erroneous. It was held in *Alyea* v. *State,* 62 Neb. 143 (86 N. W. 1066), that ·a conviction of assault and battery is improper under an information, charging an assault with intent to inflict great bodily harm, where the averments do not include a battery.

In *State* v. *Thomas,* 65 N. J. Law, 598 (48 Atl. 1007), there was an indictment for manslaughter, which charged only that the defendant did "feloniously kill and slay" the deceased, and it was held that a conviction for assault and battery could not be supported. After reciting certain excerpts from previously decided cases the court says:

"These expressions are in harmony with our constitutional Bill of Rights that in all criminal prosecutions the accused shall have the right to be informed of

the nature and cause of the accusation, a provision similar to that which the Supreme Court of Massachusetts declared to be only 'an affirmation of the ancient rule of the common law that no one shall be held to answer to an indictment or information unless the crime with which it is intended to charge him is set forth with precision and fullness.' * * Hence the most that can be said of the present indictment on this point is that it charges an offense of which assault and battery may or may not be an ingredient. Such an accusation does not distinctly and precisely inform the accused that he is charged with this lower misdemeanor, as is required by the authorities cited. At best, the charge is equivocal and inferential only."

The Indiana statute on the requisites of an indictment as set out in *State* v. *Lay,* 93 Ind. 341, is almost precisely like the Oregon Code on that subject. The decision accords with the doctrine laid down by Mr. Justice EAKIN in *State* v. *Whitney,* 54 Or. 438 (102 Pac. 288). Mr. Justice HAMMOND there said:

"Section 1908, *supra,* defines two offenses, namely, voluntary manslaughter and involuntary manslaughter. In the former the killing is done intentionally, but without malice, express or implied, and upon sudden heat. In involuntary manslaughter the killing, done in the commission of some unlawful act, is unintentional. An indictment for voluntary manslaughter will not support a conviction for involuntary manslaughter, and *vice versa: Bruner* v. *State,* 58 Ind. 159; *Adams* v. *State,* 65 Ind. 565. Though the penalty is the same in both, the crimes of voluntary and involuntary manslaughter are as separate and distinct as those of gross larceny and robbery. In determining the sufficiency of an indictment or information for manslaughter, all the sections of the statute above set out must be construed together. * * In manslaughter the indictment or information must now, as heretofore, be sufficient to charge one or the other offense of voluntary or involuntary manslaughter. The indictment in the case before us is not sufficient to charge either

offense, and under the fourth clause of Section 1759 is bad for uncertainty."

In *State* v. *McAvoy,* 73 Iowa, 557 (35 N. W. 630), it was held that the crime of assault and battery is not necessarily included within the assault to commit rape and to justify a conviction of the lesser offense. Under such an indictment it must be averred that the attempt was accompanied with some actual violence to the person of the woman. The court there said:

"But the defendant can be convicted of an offense distinct from the one specifically charged in the indictment only when such offense is an essential element of that charge, or when it is shown by proper averment in the indictment that a minor offense was in fact included in the perpetration of the one charged."

In *Scott* v. *State,* 60 Miss. 268, it is stated that a statutory indictment for murder does not embrace a charge of assault and battery with intent to murder. The court said:

"A party can only be convicted of a lesser offense than the one charged where the lesser is specifically charged as constituting part of the higher, or by an added count, where the lower is necessarily included in the higher."

These precedents would seem to dispose of the theory that an assault is necessarily involved in the allegations of the indictment before us so as to justify the instruction of the court on the subject of abortion. Moreover, the court did not undertake to instruct on assault, even if we could torture the indictment into an inclusion of that element. The trial judge invited the jury to convict the defendant of a crime of which the indictment gave him no notice whatever, and in so doing violated a constitutional right established from the beginning of jurisprudence in this country. Our

statute has undertaken to make certain groups of wrongful acts, and to apply to each one the term of manslaughter, although they are radically different from each other, containing only the common element of the death of a person. More than this, the legislature has provided forms of indictment perpetuating the distinction between these different classes of specifications. All these things are for the protection of the liberty of the citizen. It is said in Section 1439, L. O. L.:

"The manner of stating the act constituting the crime, as set forth in the appendix to this Code, is sufficient, in all cases where the averments there given are applicable, and in other cases forms may be used as nearly similar as the nature of the case will permit."

It thus imposes a duty upon the prosecuting officer in drawing his indictment to differentiate in allegation as required by the Code, and he cannot avoid this injunction by using an indefinite omnibus form, which does not notify the defendant of the particular circumstances of the crime charged. The contrary authorities are based on the doctrine that the common-law form of indictment for murder is sufficient for any charge involving homicide. These precedents are not applicable in this state, for it has been often held that there are no common-law crimes here. We must depend entirely upon our statute for the punishment of any offense. If the differences between the various kinds of murder in the second degree and of manslaughter were not to be observed, why did the legislature put them upon the statute-book and also prescribe forms indicating that the distinction should be carried into the indictment? The law-making power has provided these things for the protection of the

liberty of the citizen, and his rights are materially abused unless the injunction is observed.

Undoubtedly, a most untimely death of a young woman has occurred under circumstances where vengeance, as distinguished from the orderly administration of the law, cries aloud for a victim. But the Constitution, supreme over all of us, and the statutes in pursuance thereof have provided certain guaranteed rights for the accused which have been disregarded. In brief, there are these errors clouding the proceedings in the Circuit Court: (1) The admission of hearsay, detailing a statement of Edna Morgan about her thought concerning the possible future movement of the defendant, thus letting in an utterance of hers which she would not have been permitted to narrate if she had lived and had been called as a witness, because it was not made in the presence or knowledge of the defendant or by his authority. (2) The faulty instruction of the court, wherein it was assumed that abortion alone was a crime, without stating the other elements of the offense defined by Section 1900, L. O. L. (3) Charging the jury about forms of manslaughter of which no intimation was given to the defendant by the indictment upon which he was tried. The evidence was all circumstantial, and that on behalf of the defendant strongly controverts the contention of the prosecution. The danger of a wrong conviction on circumstantial evidence is very great. Under these conditions, as we did in *State* v. *Rader,* 62 Or. 37 (124 Pac. 195), we ought to reverse the conviction, and remand the case for the decision of a jury on a new trial.